WILLARD L. KING, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

EVIDENCE: Opinion Evidence—Sufficient Time to Get Off Track. 1 Whether an employee who was struck by a train while operating a mower on the railway right of way, had sufficient time between the warning given by a co-employee and the time the train struck him, to have stepped out of the way, is properly excluded, as calling for an opinion and as being argumentative.
SALINGER, J., dissents.

EVIDENCE: Admissibility—''Supposed to Use Sand on Rails. Evi- 2 dence of the engineer, operating the train that injured the plaintiff, as to what he was *supposed* to do in using sand on the rails, in trying to stop the train, held to have been properly stricken.
SALINGER, J., dissents.

NEGLIGENCE: Last Clear Chance—Sufficiency of Evidence—Em- 3 ployee on Railway Right of Way. Evidence reviewed, and held sufficient to justify the submission to the jury of the case on the theory of last fair chance, where a railroad employee operating a mower on the railway right of way was struck by a train.

TRIAL: Special Interrogatories—Discretion in Submitting—Error 4 only as to Ultimate Facts. The refusal to submit an interrogatory not calling for an ultimate fact, or the answer to which would not necessarily be decisive, is not error. Section 3727, Code, 1897.
SALINGER, J., dissents.

**NEGLIGENCE:** Last Clear Chance Doctrine—Erroneous Instruction Only Applies upon Discovered Peril. An instruction applying the last chance doctrine, and stating that the plaintiff would be entitled to recover, not only if the employees of the company saw plaintiff upon the track in danger of being injured, but also "if it *ought* to have been known to defendant's employees, in the exercise of reasonable and ordinary care on their part, that they might, by the exercise of reasonable diligence," have avoided a collision, is erroneous, as the last chance rule does not apply unless the person injured was actually *seen.*

**NEGLIGENCE:** Last Clear Chance Doctrine—Erroneous Instruction —Harmless Error. An instruction erroneously stating that the plaintiff could recover under the last chance doctrine if defendant *ought* to have known of plaintiff's peril, held harmless error, in view of the fact that the employees of the railway operating the train testified that they saw the employee's outfit when the train was half a mile away, and that they continued looking through the cab windows up to the time of the collision.

SALINGER, J., dissents.

**TRIAL:** Instructions—Applicability to Pleadings—Evidence. It was not error to refuse to instruct that there was no evidence that plaintiff's bad eye was in consequence of the accident, where no claim was made in the petition therefor, and none was submitted, and where the evidence showed that his right eye, at the time of the trial, was not the same as it was before the injury.

**APPEAL AND ERROR:** Assignment of Error—Brief Points—Sufficiency. Assignment of error generally to the overruling or sustaining of objections to questions asked, without referring to any *particular* question or ruling, is too indefinite for a review of the rulings.

*Appeal from Johnson District Court.*—R. P. HOWELL, Judge.

APRIL 15, 1919.

ACTION for damages consequent on a collision with defendant's train resulted in judgment for plaintiff. The defendant appeals.—*Affirmed.*

*F. W. Sargent, Frank F. Messer,* and *Robert J. Bannister,* for appellant.

*Otto & Otto* and *Dutcher & Davis,* for appellee.

LADD, C. J.—I.   About August 2, 1918, the plaintiff was
engaged in cutting weeds on the defendant's right of way
in the vicinity of the Iowa City Canning Company's Works.
This was being done with a team and mower owned by him.
The company, through its foreman, Wachs, had employed
one Norval Letts, then 17 years of age, to keep a lookout for
defendant's trains.   About 4:30 o'clock in the afternoon,
while plaintiff was operating his mower, one of defendant's
passenger trains approached from the east, at a speed of
from 35 to 40 miles an hour, and, as is alleged, negligently
omitted to give any signal or warning of its approach, of
which plaintiff was unaware; and, by reason of such neg-
lect, and a like neglect on the part of Letts, and without
fault on his part, said train struck plaintiff, the team, and
mower, seriously injuring him, killing one of the horses, in-
juring the other, and demolishing the mower.   The petition
further alleged that defendant knew, or by the exercise of
ordinary care could have known, that plaintiff was en-
gaged in mowing on its main track and switches, and was
in a place of danger, and that, in the exercise of ordinary
care, defendant's employee could have stopped the train and
avoided the collision, but failed so to do, in consequence of
which the injuries mentioned occurred.   A general denial
and charge of contributory negligence were interposed by
defendant's answer.

That plaintiff, as employee of defendant, was engaged
in cutting the grass along defendant's right of way, is not
disputed.   He had done so for several years, but not previ-
ously as close to the track as required when hurt.   He was
employed by the section foreman, who undertook to provide
"someone to take care of him,"—that is, to keep a lookout
for approaching trains, and assist him in the work.   Norval
Letts undertook so to do.   As testified by plaintiff, the work
had proceeded until, "in the afternoon, I was on the north
side of the track; I started on the north rail by Smith's

Crossing. I was pretty near to the end when the train over-took me,—I guess about a quarter of a mile, I should think, —maybe a little better. Going along this track, you have to move awfully slow, got to hold your horses tight, keep them exact on the rail, and keep the lines tight in your hands. I had a rope on the end of the sickle bar." He then explained that he had removed the dividing board, and put a rope on in its place, long enough so that the boy would not get into the machine; that the boy would raise the bar, upon approaching an obstruction. "Where this accident happened, it was graded 10 to 12 feet high." A signal post was at that point, north of the track. As the mower reached it, "the boy made a scream; raised the sickle bar up. I sup-posed he caught on the bar. I look over my shoulder this way around, and it (train) was right behind me, and I im-mediately jumped off the seat to save myself,—I was scared so bad. Before I could get away from the machine,—smash! I didn't know no more; I was gone to the world."

On the other hand, the engineer testified that he gave four short whistles, when within 200 or 300 feet of plaintiff.

"I did not know just exactly the distance. I saw a man come from the north side of the team, go to the south side. That was after I gave this warning whistle. I had run a little west from where I gave the signal. He reached down for something. I do not know what he was doing. I supposed he was going to pick up the lines and drive his team away; then he turned around, and gave me his signal to stop. He gave this signal with his hat."

And then the collision.

Letts swore that, when about 15 feet from the block signal, the team was started, plaintiff walking on the south side of the mower; that, on reaching the block signal, he raised the sickle bar, and, as it caught between some boards running to the signal block, the knives dropped down.

"The train was right on top of the hill, when I seen it

first, about half a mile away. I hallooed to him that the train was coming. He drove up in there; then he got caught. I saw the train before the sickle bar got caught. After the machine was caught there, Mr. King told me to try to pull the bar out, and I tried it. He kept going ahead with his team, kept pulling his team; he hit them with the lines. He was in the middle of the track. We have to drive between the block signal and the track, to get through, but he could have went down below and around. Q. Now, after Mr. King pulled his team over, as you say he did, what did he do, if anything, if he did anything more,—before this train struck? A. Why, he unhooked one tug, run around, unhooked the gray horse tug,—just run around. When he got half way, the train hit. He ran around to the south. The gray horse tug he unhooked was on the north side. Just after he un-hooked the gray horse tug on the north side, he run around, was going to unhook the other tug of the other horse. Just about that time, I jumped down hill. I was not close to it when the train struck the mower. When I was on the edge of the ties yet, the train was close to me. I was down the hill when the train struck the mower."

These excerpts from the evidence indicate the nature of the evidence bearing on the issues as to defendant's employee's alleged negligence and that of Letts, as well as the alleged contributory negligence on the part of plaintiff.

II.    After Letts testified as stated, he was asked to "state whether or not there was enough time elapsed between the time you called to him, 'There is the train,' and the time it struck the mower, for him to have stepped out of the way?" An objection as calling for an opinion and argumentative was sustained, and, we think, rightly so. To answer it, he must first have concluded at what speed the train was moving, where the train was at that time, how a

1. EVIDENCE: opinion evidence: sufficient time to get off track.

person of ordinary prudence would be likely to have acted before the mower was hit, and what efforts he would have made to save himself. The inquiry exacted a conclusion, to be drawn from many controverted facts, and, owing to this, was not permissible. Moreover, it required of the witness to say what the jury necessarily should have passed on: that is, whether, notwithstanding all that happened, he had time to have stepped away, and avoided injury. If, in the exercise of reasonable care, he had time enough to escape, there could have been no recovery for the personal injuries as claimed. All matters bearing on the issue submitted to the witness were shown the jurors, and they were as well qualified as the witness to pass thereon. The ruling is to be distinguished from that in *Boice v. Des Moines City R. Co.*, 153 Iowa 472, where objection to this question, propounded to plaintiff, was overruled: "Whether or not, if the conductor had not asked you to stop, you would have had time to get on the car before it started?" Without approving this ruling, the inquiry related to what the witness could have done in a certain time; while, in the case at bar, the inquiry called for the witness' judgment as to whether another could have stepped out of the way of a moving train, in a time to be estimated by the witness from conflicting evidence. For these reasons, there was no error in the ruling.

III. The engineer operating the train, when asked if "sand is of any benefit when you have a dry rail," answered: "Not to amount to anything. * * * Q. It wasn't raining that day? A. I know it wasn't,—

2. EVIDENCE: admissibility: "supposed to use sand on rails."

this sand wouldn't amount to anything. Q. I will put it in another form. You don't mean to say to the jury on a dry rail sand won't help you stop a train? A. It doesn't amount to very much. Q. It does some? A. Some,—it might,—not very much. Q. It is carried on the engine for that purpose, isn't it? A. To a certain extent."

Re-direct Examination.

"Q. For what purpose is sand carried on the engine? A. For a bad rail. Q. You mean wet or slippery rail? A. Yes, or any frosty morning, or dew on the rail,—anything like that. That is when you are supposed to use your sand, but on occasions like that we are not supposed to use that sand."

A motion to strike out what he is supposed to do, as incompetent, immaterial, and irrelevant, was sustained.

As the collision occurred in an afternoon of August, there could have been no frost nor dew; and therefore, whether "you are supposed to use sand" on a frosty morning, or when dew is on the rail, is immaterial. The last clause either refers to where the rail is dry, or is meaningless. If reference was had to a dry rail, in mentioning "occasions like that," then the ruling was favorable to defendant, and it cannot be heard to complain, for that no sand was used in stopping the train. The context indicates plainly enough that the witness, by saying what was supposed to be done or omitted, had reference to when the sand should be used, or customarily was used. He was qualified to testify on the subject, and we discover no error.

IV.   An instruction that there was no evidence warranting the submission to the jury of the issue of the last fair chance was requested and refused, and defendant moved to strike all evidence bearing thereon from the record. This motion was rightly overruled, for that much, if not all, of such evidence related to other issues; and there was no error in refusing to give the instruction.

3. NEGLIGENCE: last clear chance: sufficiency of evidence: employee on railway right of way.

The fireman on the train testified that he—

"Saw the outfit about half a mile west, when they were coming over that knoll right at that crossing there, and

looked like three men to me at the time,—I couldn't distinguish them. I was ringing the bell for the crossing. I kept ringing the bell from then on down, and we got within 600 or 800 feet of this outfit, and we could distinguish them,— distinguish two horses and a man; and the engineer blew a warning whistle, and I was ringing the bell; and the man was between the rails, stooping over, like as though he were picking up the lines; and when we went on down within 80 to 100 feet of him, why, he stood upright, and took his hat off to flag us down, and almost instantaneously he started west, and went around the head of the horses, and that is the last I saw of him. The train was going 35 or 40 miles an hour. I was riding on the south side of the engine. This crossing I spoke of is at the top of the hill, about half a mile away. I thought he was going to pick up the lines and drive the team in the clear."

The testimony of the engineer was that he—

"Was riding on the right-hand side, or the north side of the cab. I first saw this team and mower about half a mile away. I saw that team of horses there. I didn't see any man with them. The team seemed stationed there. I could not tell, from where I was, whether they were moving away or not. I first saw them just about at the private crossing, just as we come from the private crossing. The first public highway is about a mile east of that. I gave a warning signal to this man on the track. I gave four short whistles. My engine was a couple or three hundred feet from them when I gave this warning whistle. I don't know just exactly the distance. I saw the man come from the north side of the team, go to the south side. That was after I gave the warning whistle. I had run a little west from where I gave the signal. He reached down for something,—I don't know what he was doing,—I supposed he was going to pick up the lines and drive his team away; then he turned round and gave a signal to stop. He gave this signal with his hat.

\* \* \*   Q. How close were you to the team when you did that?   A. Oh, I was maybe 50 feet.   \* \* \*   There was nothing more I could have done to stop the train any quicker.   It is of no value in making a quick stop to reverse the engine.   It has the effect of causing the wheels to slide.   We always figure on not allowing the wheels to slide."

He then testified that he had passed a number of graders and a few men mowing weeds along the track; and that it is supposed the men will get out of the road at the approach of the train; and that, when he noticed the outfit in question, he thought plaintiff would get out of the way; and that his experience had led him to expect men on the track to wait until the engine was 25 or 50 feet away, before leaving the track; that both the horses were north of the track, but he did not see the machine, nor more than one man; that he "stopped the train as soon as he could after he flagged us down."   The witness further testified that, when running 40 miles an hour, he could stop the train within 700 feet.

"Q. Did you ever see a man before this time on a track running a mower with a wheel along between the rails mowing weeds?   A. No, sir, never did."   This evidence leaves no doubt that plaintiff, with his team, was seen on the railroad track by the employees of the defendant when at a distance east of said team much farther than required within which to stop the train and avoid the collision.   And yet, according to the engineer, no signal was given until 200 or 300 feet from him, or after all possibility of avoiding injury, were he to remain where he was, had passed.   Apparently, he was then making no effort to get off the track; for, as the engineer says, "the team seemed stationed there," and he could not tell whether "they were moving away or not."   As the train moved west, after the signal, according to both these witnesses, plaintiff then came from the north side of the team, went to the south side, reached down for something, which both witnesses thought to be the lines; and as

he rose, he signaled with his hat to stop. This was when the train was within 50 to 100 feet from plaintiff, and the engineer then did everything he could to stop the train, but this was too late; for the evidence that it must have moved 700 feet before brought to a stop was undisputed. The evidence was without conflict that the engineer observed this man and team, apparently giving no heed to the approaching train, when a half mile away; that, though the fireman testified to ringing the bell continuously, the engineer gave no warning whistle until too near the man and team to stop the train in time to avoid the collision; and manifestly, the only debatable issue is whether the engineer was, in view of the situation, negligent in not having his train under control, so as to be able to stop it, and in not stopping it in time to avoid injuring plaintiff and his property, in event that he was unable to, or did not, get from in front thereof. Plaintiff was an employee of the company, engaged where he had the right to be, and the employees in charge of the train owed him the duty of exercising ordinary care, not only in keeping a lookout for him when at work, but to guard against injuring his person or property while there. Whether, in the exercise of such care, they might properly have assumed that he would get from in front of the approaching train, and therefore not take any precautions for his protection, as in slowing its speed so as to be able to stop in time to avoid injury, was for the jury to decide. That both the engineer and fireman observed his situation is undisputed. The jury might well have found that these employees were aware that he was unmindful of the approach of this train at the high speed of 40 miles an hour, when more than 700 feet, the distance within which it could have been stopped, from him, and that, because he was oblivious of such approach, as the jury might have found he was, his situation was one of great peril, and so known to those operating the train, in time to have avoided the collision. This being so,

there was no error in submitting the cause on the theory of last fair chance to the jury.

V.   The defendant requested submission of the following special interrogatory: "How far away was the train when plaintiff first learned it was coming?"   The plaintiff objected thereto on the ground that it did

4. TRIAL: special interrogatories: discretion in submitting: error only as to ultimate facts.

not call for an answer conclusive upon any issue in this case, did not require a finding as to a single element of neglect, was not controlling of the verdict, and was confusing.   The court refused to submit the interrogatory.   Section 3727 of the Code declares that the jury "may be required by the court, and must be so required on the request of any party to the action, to find specially upon any particular questions of fact, to be stated to it in writing."   Though the statute does not specify the particular questions of fact which may be propounded to the jury, it is necessarily to be inferred that these are such as will serve some purpose in the trial, either by exacting from the jury a decisive finding, or the determination of some fact affecting the result.   As said in *Morbey v. Chicago & N. W. R. Co.*, 116 Iowa 84:

"The design of special interrogatories is to point out the controlling questions in the case, exact for them separate consideration, and thereby guard against misapprehension of what are the vital issues to be determined.   When the answers cover all the ultimate facts, these furnish a full explanation of the general verdict, and a safe test of its accuracy.   Their use, however, should never be perverted to the purpose of confusing and misleading jurors, nor to that of merely satisfying the curiosity of parties.   Yet this might, and no doubt would, often be the result, if, upon the request of either party, the jury must be required to find 'specially upon any particular question of fact, regardless of whether it inhered in or affected the general verdict.'   A finding on

any question if it relate to 'material matters bearing on the issues' contended to be sufficient by appellant, if not involving the final result, could be of no real advantage to either party. 'However natural the curiosity parties may have to know the course of reasoning by which jurors may arrive at verdicts either for or against them, they have no right, under guise of submitting questions of fact to be found especially by the jury, to require them to give their views upon each item of evidence, and thus practically subject them to a cross-examination as to the entire case.' "

On these grounds, this court has uniformly held that it is not error to refuse to submit to the jury interrogatories calling for other than ultimate facts. *Trumble v. Happy,* 114 Iowa 624; *Wilder v. Great Western Cereal Co.,* 130 Iowa 263; *Payne v. Waterloo, C. F. & N. R. Co.,* 153 Iowa 445. Nor is the court required to submit any interrogatory the answer to which would not be decisive of the cause or claim contained therein. *Nodle v. Hawthorn,* 107 Iowa 380; *Jones v. Ford,* 154 Iowa 549; *Ottaway v. Milroy,* 144 Iowa 631; *Neidy v. Littlejohn,* 146 Iowa 355. To require the submission of a special interrogatory, it must call for an ultimate fact, and an answer decisive of the case or some claim involved therein. *Heinmiller v. Winston Bros.,* 131 Iowa 32; *Brown Land Co. v. Lehman,* 134 Iowa 712; *Schulte v. Chicago, M. & St. P. R. Co.,* 114 Iowa 89; *Rutherford v. Iowa Cent. R. Co.,* 142 Iowa 744. If the interrogatory does not exact an answer calling for an ultimate fact, or is not decisive of the case or claim involved therein, it is not error to refuse the same. *Kuehl v. Chicago, M. & St. P. R. Co.,* 126 Iowa 638; *Engvall v. Des Moines City R. Co.,* 145 Iowa 560; *Luisi v. Chicago G. W. R. Co.,* 155 Iowa 458.

There are cases, however, where the refusal of a proper special interrogatory or some other irregularity will not be regarded as error. *Brooks v. Van Buren County,* 155 Iowa 282; *Conway v. Murphy,* 135 Iowa 171; *Taylor v. Wabash*

*R. Co.*, 112 Iowa 157; *McGuire v. Chicago, B. & Q. R. Co.*, 138 Iowa 664; *Luisi v. Chicago G. W. R. Co.*, 155 Iowa 458.

It is not always easy to determine what is an ultimate fact, or what answer will necessarily be decisive of the issue, and it may be that decisions will be found impinging somewhat on the rules as recited above. Thus, it may be doubtful whether all the interrogatories submitted to the jury in *Decatur v. Simpson*, 115 Iowa 348, copied from *Beck v. German Klinik*, 78 Iowa 696, were ultimate and decisive; but the decisions upholding their submission were on the ground that they "called for ultimate facts inhering in and necessary to be determined in reaching a verdict."

In *Runkle v. Hartford Ins. Co.*, 99 Iowa 414, in approving the refusal to submit certain interrogatories, it was said that:

"The court was not required to submit interrogatories for findings of fact not necessarily determinative of the case, nor to submit particular questions not ultimate in their nature, or which could not well be considered or answered without danger of conclusion or misrepresentation."

In sustaining the refusal to submit interrogatories, in *O'Leary Bros. v. German-American Ins. Co.*, 100 Iowa 390, the court said:

"It is not error to refuse to submit interrogatories as to immaterial facts, nor that are not ultimate in their nature, that may not be answered by 'Yes' or 'No,' or in some other brief or pertinent way."

See, also, *Hawley v. Chicago, B. & Q. R. Co.*, 71 Iowa 717; *Thomas v. Schee*, 80 Iowa 237, 238.

In *In re Estate of Townsend*, 122 Iowa 253, the defendant requested the submission of ten special interrogatories, which the court refused; and it was held that the first, sixth, and eighth should have been given, for that "they each called for ultimate facts, material to the issue in the case." Though it be doubtful whether one or two of these inter-

rogatories were such as designated, the error in refusal was put on the ground stated; and in *Scagel v. Chicago, M. & St. P. R. Co.*, 83 Iowa 380, the refusal to submit several interrogatories was justified, for that the answer "would not have controlled the general verdict, and is not reversible error."

It is apparent from these decisions that, regardless of how the language of the statute might have been construed, it has actually and uniformly been so construed as that, to constitute error in the refusal of a special interrogatory, it must have called for an ultimate fact, and an answer decisive of the case or of some claim involved therein. A large discretion is lodged in the trial court in the matter of submitting questions to the jury, even though omitting one or both of these elements; but we know of no case declaring that the refusal to submit an interrogatory not calling for an ultimate fact, or the answer to which would necessarily be decisive, has been regarded as an error. In the absence of prejudice, submission of interrogatories cannot well be denounced as erroneous. Error may be predicated only on the refusal of an interrogatory exacting an answer decisive of the case and calling for an ultimate fact. Any answer that might have been made would not have been controlling or decisive of any issue in this case, nor would it have called for an ultimate fact. The defendant might have been found negligent had plaintiff not observed its train until looking over his shoulder immediately before being struck, as he testified, or if he had seen it much farther back, and without fault, had he observed its approach at the time described by Letts and other witnesses. There was no error in refusing to submit the special interrogatory.

The doctrine of last fair chance was submitted in the eighth instruction. The first two objections thereto relate to the state of the evidence, rather than to the rules of law

found in the instruction. Thus, in the first, it is said the evidence was insufficient to warrant giving the instruction. We have already ruled otherwise. The second objection reads:

5. NEGLIGENCE:
last clear
chance doc-
trine: errone-
ous instruction
only applies up-
on discovered
peril.

"There is no competent evidence that, at any time after it became apparent to the engine men, as reasonable men, that the plaintiff was in danger of being injured, there was no effort to stop the train to prevent the injury, under the undisputed evidence."

This again fails to criticise the instruction. It seems to assert that there was no evidence that, after the engineer observed plaintiff in danger, there was no effort to stop the train. If it does not mean this, we are unable to interpret the language used; and if it does, no one will pretend that it was necessary to prove that no effort was made. The evidence was such that the jury might have found that, after the discovery of such danger, no timely effort such as ordinary prudence dictated was made to avoid injury.

The first part of the third objection was that the instruction "requires too high a degree of care on the part of the appellee." This point was not raised in brief point or argument.

The exception taken in the brief point and argument is to that part of the instruction wherein the jury is told not only that, if "the employees of the defendant company saw plaintiff upon the track and in danger of being injured," but also that *if it ought to have been known to defendant's employees, in the exercise of reasonable and ordinary care on their part* that they might, by the exercise of reasonable diligence" have avoided the collision, then plaintiff would be entitled to recovery. If the words in italic were properly included, the degree of care exacted, i. e., ordinary care, was such as by law required. The trouble with the instruction is that these words should have been omitted. Their omission,

however, would not have changed the degree of care required from defendant,—that is, ordinary care to avoid injury to the plaintiff. The error was in defining a situation in which it was said the doctrine of last fair chance applied,—that is, when defendant's employees did not know, but ought to have known, the plaintiff's peril; and such was the error assigned and argued. This did not involve a higher measure of care on the part of either party than exacted by law, as expressed in the instruction. The statute then in force required that:

"All objections or exceptions thereto must be made before the instructions are read to the jury and must point out the grounds thereof specifically and with reasonable exactness; * * * and no other objections or exceptions shall be considered by the trial court upon motion for a new trial or otherwise, or by the Supreme Court upon appeal." Section 3705-a of the Code Supplement, 1913.

The error complained of was not in the degree of care exacted, but that a situation was stated in which the doctrine of last fair chance ought not to have been applied. This objection was rightly disregarded.

The counsel in their argument referred only to the above objections, but, as appears from the abstract, later on, an objection was interposed to this instruction on the ground that "it submits the case to the jury upon the theory, not what defendant's employees knew, or knew and from knowing was reasonably apparent to them, but upon the theory of what ought to have been known and should have been seen in the exercise of ordinary care, whereas no duty arises under said doctrine (last fair chance) until the plaintiff is seen and his dangerous predicament is or should be appreciated." The writer was misled in the first instance by the quotation of the objections in appellant's brief, previously considered, and entire omission of reference thereto. The instruction was erroneous, as appears in *Bourrett v. Chicago & N. W. R. Co.*, 152 Iowa 579, 582, and subsequent decisions.

The error, however, was without prejudice. Both the engineer and fireman testified that they saw the plaintiff's outfit when the train was about one-half mile from where the collision occurred. The fireman testified that he kept looking at such outfit until the head of the engine cut off his view; that he saw only one man, but did not see the mower; that he kept ringing the bell for the crossing until within 600 or 800 feet of the outfit, when the engineer blew a warning whistle. The engineer swore that he was 200 or 300 feet from the outfit when the whistle was blown, but that he did not exactly know the distance; that he then noticed the plaintiff come around from the north of the team; that he then gave a signal and shut off the air; that he saw only one man; that when he saw plaintiff come around from the north of the horses was the first time he saw them. The day was bright, and the road straight. As the evidence of the engineer and fireman is that they saw the outfit at a distance of a half mile, and that they continued in their seats and continued looking through the cab windows up to the time of the collision, there is no room for saying that they did not see whatever anyone would have seen, and therefore they necessarily saw what one in the exercise of ordinary care would have seen. Said employees are held to have appreciated plaintiff's peril, if a person of ordinary prudence would have done so, and this issue was fairly submitted to the jury by the instruction under consideration. The error was, then, without prejudice.

6. NEGLIGENCE: last clear chance doctrine: erroneous instruction: harmless error.

Objections raised to the seventh instruction require no attention.

Complaint is made of the court's refusal to instruct the jury that there was no evidence that plaintiff's bad eye was in consequence of the accident; that defendant was not re-

sponsible therefor; and that the claim was

**7. TRIAL: instructions: applicability to pleadings: evidence.** withdrawn from consideration.

No claim for injury to the eyes was made in the petition, nor was any submitted. Moreover, there was evidence that his sight "was number one" before, and that his right eye, at the time of the trial, "glimmers." In this state of the record, there was no error in refusing to instruct as requested.

Errors 4 and 5 are assigned generally to the overruling or sustaining "objections" to questions asked certain witnesses, without referring to any particular question or ruling. The brief point is no more definite.

**8. APPEAL AND ERROR: assignment of error: brief points: sufficiency.** This is too indefinite to call for a review of the rulings, and that challenged in the second assignment of errors is not debatable.

We discover no reversible error, and the judgment is—*Affirmed.*

EVANS, GAYNOR, PRESTON, and STEVENS, JJ., concur.

SALINGER, J. (dissenting). I. Many matters raised in the brief are not mentioned in the opinion. I take it the reason for this is that the matters are deemed not to have been presented in rule manner. In my opinion, the assignments should be mentioned and disposed of for that reason.

II. There is complaint of the striking of certain testimony given by defendant's engineer, and the majority sustains the ruling.

It is difficult to determine from the record just what the court in fact excluded. The appellant asserts it was one thing, but its assertion is not proof. A different situation arises if it be the fact that appellee has conceded what the ruling of the court was. That concession would bind him, where, as here, there is doubt as to what the ruling in fact was. If appellee has conceded what a sustained ruling is, he is not entitled to the benefit of the rule that, where an objection is sustained, the ruling will not be interfered with

if, though erroneous on the objection made, it can be sustained for any good reason. Where appellee admits what a ruling was, and states upon what ground he defends it, there should be a reversal if, when so defined, the ruling is erroneous.

The stricken testimony was that, under the conditions existing, the employees were not supposed to use sand. Appellee states in his brief that this was rightly excluded because testimony as to a duty is admissible only where the duty is founded in usage, custom, or experience in the business, and such evidence may not be received where the duty spoken to is founded upon specific directions; and that same was rightly stricken for the further reason that the facts themselves could be fully disclosed to the jury for judgment and deduction.

The record clearly shows the excluded matter does refer to a duty founded in usage, custom, or experience in the business; there is not a suggestion that the witness speaks to a duty founded upon specific directions. And, within reasonable length, no statement of facts could as clearly put before the jury what the duty in the premises was as the statement of an experienced engineer who ran the very train that caused the injury. I am of opinion that testimony held to be admissible in *Quinlan v. Chicago, R. I. & P. R. Co.*, 113 Iowa 89, and *Yeager v. Chicago, R. I. & P. R. Co.*, 148 Iowa 231, was much more objectionable than that excluded here. And I see nothing in cases like *Allen v. B., C. R. & N. R. Co.*, 57 Iowa 623, 624, or *Muldowney v. Illinois Cent. R. Co.*, 36 Iowa 462, or *Curl v. Chicago, R. I. & P. R. Co.*, 63 Iowa 417, which affects the rule in cases like that of *Quinlan* or *Yeager*.

III. I am of opinion it was error to refuse to let a witness who was present say whether or not enough time elapsed between the time the witness called to plaintiff "There is a train," and the time it struck the mower of the plaintiff,

for him to have stepped out of the way. As I construe it, it is fairly settled by *Boice v. Des Moines City R. Co.*, 153 Iowa 472, *Gray v. Chicago, R. I. & P. R. Co.*, 143 Iowa 268, and *Robinson v. Springfield St. R. Co.*, 211 Mass. 483 (98 N. E. 576), that this testimony was competent, and should be received. I do not think the fact that, in one of these cases cited above, such testimony was held to be rightly admitted, changes the rule. If testimony is incompetent, it is incompetent whether the court receives it, and so the complaint is made of the reception, or rejects it, and so the complaint is of exclusion. The action of the court does not change the nature of the testimony.

I do not overlook that, in the *Boice* case, there is the casual statement that "the rulings as to this question and two or three others of similar character were so plainly within the exercise of a proper discretion on the part of a trial judge that no further discussion of them seems to be required." What I do say is that this casual statement does not establish it would not have been held error had the testimony been rejected. The reasons given for approving the reception are such that no casual remarks about the matter's being discretionary can obviate that the *Boice* case is an express holding that there is a right to have such testimony received. Its reception is approved on the ground that what was received was admissible, of necessity, because, though a conclusion, it was one that "could be drawn only from all the attending facts and circumstances as known to plaintiff:" in effect, that the testimony was the only practical way of bringing the point before the jury. When an ultimate evidentiary factor can be put before the jury only by a statement in the form of a conclusion, there is a right to put that conclusion before the jury. A refusal to receive it would be a refusal to let the jury hear material matter that could be submitted to it only in the form proposed. It is not a matter of discretion to reject what is the only practical form

of making material proof.   The majority is diffident about what to do with the *Boice* case, and studiously refrains from "approving this ruling."   It should be approved and followed.   I have already indicated why I think it makes no difference that, in the *Boice* case, the objections to the evidence were overruled, while here they were sustained,—a distinction which the majority draws.   It is remarkable that the finale is a holding that the evidence was rightly excluded because "the inquiry exacted a conclusion to be drawn from many controverted facts, and, owing to this, was not permissible."   The *Boice* case holds that such testimony is receivable because it *is* a deduction from such facts.   In other words, the majority sustains the exclusion of testimony for the very reason upon which the *Boice* case and many other authorities hold it is receivable.

IV.   The court refused to submit a special interrogatory asked by defendant as to how far the train was away from plaintiff when plaintiff was first advised of its coming.   It is proposed to affirm this refusal on the ground that the interrogatory called for nothing which was necessarily determinative of the case.   It is not to be denied that many of our decisions have held that the interrogatory must be one that is necessarily determinative of the case.   I submit that these decisions simply rewrote the statute, because the court believed that it would be mischievous to give the statute the only meaning which its plain words have.   These words are that a special interrogatory shall be submitted "upon any particular questions of fact, to be stated to it in writing."   Code Section 3727.   It may be too late to recede from these, and to leave to the legislature to make such change in this statute as will avoid the things for fear of which this court has rewritten the statute.   It is not amiss to add that, while we have often held that no interrogatory should be submitted unless it calls for some ultimate fact determinative of the suit, we have also held that they should

not be submitted whenever they do call for just such a fact, or call for the very matters which it is the province of the jury to determine by the general verdict. See *Bruggeman v. Illinois Cent. R. Co.*, 147 Iowa 187; *O'Leary Bros. v. German-American Ins. Co.*, 100 Iowa 390. All I care to emphasize is that, whatever classification the interrogatory at bar belongs to, there have been reversals for refusing to submit interrogatories which were not in the least more ultimate or determinative than is the interrogatory at bar. This must have been done on the theory that the submission of interrogatories should not be refused where the answer may be of use to the court for some purposes,—say, on determining on motion for new trial whether the verdict is the result of passion and prejudice. At any rate, I submit once more that we have upheld the right to interrogatories that were not more ultimate or determinative than the one which was refused in this case. And since the majority attempts a distinction between complaint that an interrogatory was submitted, and a complaint that it was refused, I call attention to the fact that, in the cases I shall cite, there was a reversal for refusing to submit what, as said, I think is not one whit more determinative than the interrogatory at bar. It may be true that reversal was accomplished by the argument that refusal was erroneous because the interrogatory requested *was* ultimate and determinative. Though that was done, it does not change the interrogatory passed upon. If these cases reverse by holding just such an interrogatory as the one at bar was ultimate and determinative, then the classification is immaterial; for the same authority that did the classifying would settle that this particular interrogatory now in review was ultimate and determinative.

*Decatur v. Simpson*, 115 Iowa 348, was a malpractice suit. There was a reversal for failure to give some interrogatories which are not in any way more decisive than the one at bar. In other words, they were not determinative of

the case, no matter how answered.  One question was wheth-
·er the defendants had properly treated plaintiff from the
day on which they set his leg, up to the time they released
him.  Whether they did or did not would not necessarily
decide the suit.  So of another question, which was whether
the methods and appliances used in the treatment were those
generally approved by medical practitioners of average skill.
Another inquiry was whether plaintiff's leg, when taken
from the splint and bandages, was as crooked, or nearly as
crooked, as when amputated.  The most an answer to this
could do would be to bear on the amount that might justly
be recovered.  All it could do would be to aid the court, if it
were appealed to to grant a new trial.  The case of *In re
Estate of Townsend,* 122 Iowa 246, was a will contest.  Two
interrogatories, for refusal to give which there was a re-
versal, are certainly not more determinative than the inter-
rogatory at bar.  They inquired whether the proponents
knew of the intention of the testator to make the will, before
the same was made, and whether they knew, prior to the
death of testator, that he had made a will.  *Day v. City of
Mt. Pleasant,* 70 Iowa 193, was an action to recover dam-
ages for personal injuries sustained from falling into a cel-
larway constructed in the sidewalk of one of the principal
business streets of defendant.  There was a reversal for re-
fusing to submit interrogatories.  One of them inquired
whether there was sufficient light furnished at the place of
the injury to enable a person with ordinary sight and using
ordinary care to see the cellar opening.  Clearly, whether
such light was present or absent would not, of itself, settle
which way the recovery should go.  There might be no lia-
bility though the light was insufficient.  There might be a
recovery though the light was sufficient.  My conclusion is
that, upon the statute, and on reasoning and authority, it
was error not to submit the interrogatory asked by appellant.

    V.   Instruction 8 charged that, if the employees of the

defendant saw the plaintiff upon the track, "and in danger of being injured and damaged, and had time, in the exercise of reasonable and ordinary care, to have prevented injury and damage to plaintiff, *or if it ought to have been known to defendant's employees, in the exercise of reasonable and ordinary care on their part, that they might, by exercise of reasonable diligence on their part in giving signals,* warn plaintiff of his danger, or by using appliances at their command to stop the train have avoided the injury to plaintiff, and that, but for this neglect on their part, he would not have been injured or damaged, then the defendant was guilty of neglect." The majority concedes that the portion of this instruction which is in Italic here was erroneous, on the authority of *Bourrett v. Chicago & N. W. R. Co.*, 152 Iowa 579, 582, and subsequent decisions. One attempted avoidance of this error is that the exceptions to the charge do not raise such error. One exception was that the instruction "requires too high a degree of care on the part of defendant's employees." In the view of the majority, this exception is insufficient, because ordinary care was due the plaintiff, and that the charge, including the erroneous part, requires no more than ordinary care,—wherefore, an exception that same requires too high a degree of care is not well taken; that there was no error in requiring more than ordinary care demands, but "error in defining a situation in which the doctrine of last fair chance applies." A charge may be erroneous though it do not burden the defendant with more than ordinary care if there be error in defining what, in the circumstances, is ordinary care. As I view it, the court injected into a correct statement of what was ordinary care the incorrect statement that it was a lack of ordinary care, in the purview of the doctrine of the last fair chance, if, by using ordinary care, the employees might have ascertained, in time to save him, that plaintiff was in a perilous position. As there is no liability for failure to give

the last clear chance unless there was a wanton abstinence from effort to save one who was recognized to be in a place of peril, it is, of necessity, more than the care due to ascertain whether someone might not be in a place of peril. It would seem to follow that this exception was sufficiently definite, and that, therefore, the majority errs in its attempt to avoid the error on the score that the exception lacked definiteness. The majority adds, "This was not raised in brief point or argument." It is settled in this court that the one essential to appellate review is a brief point, supported by the exceptions. *Powers v. Iowa Glue Co.*, 183 Iowa 1082. Brief Point 11 is, it was error to give this instruction because, at least as to steam railroads, "the doctrine .of the last clear chance does not apply when one who is negligently on the track might have been discovered, but only where he actually was discovered." It has been noted the majority concedes the instruction was erroneous on the authority of *Bourrett v. Chicago & N. W. R. Co.* In support of this brief point, there is a citation of the *Bourrett* case and of many other cases of which the majority says that they support the same point that is ruled by the *Bourrett* case. It would seem, then, that this brief point does sufficiently make complaint that Instruction 8 errs in holding it sufficient that the plaintiff might have been discovered, when it should have charged that there was no application of the doctrine of the last fair chance unless he actually was discovered. As to the statement that the point is not raised in argument, we have held that, while amplification by argument is both permitted and desirable, it is optional, and that failure to argue *in extenso* does not waive appellate review if the brief point be sufficient. *Powers v. Iowa Glue Co.*, 183 Iowa 1082. Though such argument was not essential, yet it is made. This brief point is fully and extensively argued, and on the lines made by the brief point. See pages 41 to 45, appellant's brief.

## 5-a

Since this was first written, it has been discovered there was an additional exception to the instruction, which all agree does raise the very point now in consideration. This exception was overlooked, because it is somewhat detached from other exceptions dealing with the same instruction. But being now found, it must have consideration. That exception was that the charge was in error because "it submits the case to the jury upon the theory, not what defendant's employees knew, or knew and from knowing was reasonably apparent to them, but upon the theory of what ought to have been known and should have been seen in the exercise of ordinary care; whereas no duty arises under the doctrine of the last fair chance until the plaintiff is seen and his dangerous predicament is or should be appreciated." As said, we are all agreed that the charge was erroneous, and that this last exception adequately raises the error, so far as exceptions are concerned. As to this, there seems to be no claim, and there could not well be one, that the brief points and the arguments do not adequately present the exception. The avoidance this time is that the error was without prejudice. This holding of the majority is based upon the fact that it appears without conflict the engineer and fireman saw the plaintiff's outfit when the train was still a half mile away from the point where the collision occurred; that the fireman kept looking at the outfit until the head of the engine cut off his view; that he saw only one man, but did not see the mower; that he kept ringing the bell for the crossing until within 600 or 800 feet of the outfit, at which point the engineer blew a warning whistle. The engineer testifies he was 200 or 300 feet from the outfit when the whistle was blown, but did not exactly know the distance; that he then noticed the plaintiff come around from the north of the team, and then gave a signal and shut off the air; that he saw only one man; that the first time he saw plaintiff was when he came around from the north of the horses. It fur-

ther appears the day was bright and the road straight. Upon this is based the ultimate deduction that there was no prejudice in giving this erroneous instruction, because "there is no room for saying that they do not see what anyone would, or might have seen in the exercise of ordinary diligence." In effect, the majority holds the erroneous charge was without prejudice because the employees of the defendant actually did see the plaintiff in time to have avoided injuring him. The trouble is that the last fair chance rule is not invoked merely by the fact that the injured person was seen in time to be saved by the exercise of ordinary care, but that it must be appreciated that the person seen is in a peril which. demands an effort to save him. I do not say we may hold, as matter of law, that the peril of this defendant was not appreciated in time, but do contend that, at the least, it was a question for the jury whether the employees of defendant, after seeing plaintiff and appreciating that he was in a place of peril, still made no effort to save him, when reasonable effort might or would have done so. I agree that the error in the instruction was without prejudice if we may hold, as matter of law, not only that the plaintiff was seen in ample time to be protected, but that, after he was seen, and it was appreciated he was in danger, no reasonable care was used to avert that danger. I base my dissent from the holding that this error was without prejudice upon the one proposition that we cannot hold this essential element to be established as matter of law.

5-b

It is not as clear to me as I could wish, but I think it may be gathered from the majority opinion that this error in charging was without prejudice for the further reason that plaintiff was, as matter of law, free from contributory negligence. It seems to me the record demonstrates it was at least a question for the jury whether this is so. Freedom from such negligence was directly put in issue by the peti-

tion and answer. The last statement in Instruction 8 shows that the presence or absence of contributory negligence was for the jury, because this statement charges the jury what to do if and though they found that plaintiff was guilty of such negligence. Instruction 9 advises of the effect, should it be found that there was contributory negligence. Other instructions define what such negligence consists of. The entire trial theory assumed that contributory negligence was, in this case, a jury question. The error aforesaid, then, is not avoided on the reasoning that, as matter of law, there was no contributory negligence. It is not amiss to add that if, as matter of law, contributory negligence was absent, it was misleading to inject into the charge an instruction which, whether abstractly right or erroneous, had no business in a suit where contributory negligence was absent. Such an instruction was due only to define what would avoid contributory negligence. It should not have been given at all if there was no such negligence to avoid. I would reverse.