MARY IPSEN et al., appellees, v. LOUIS F. RUESS, individually and as executor, et al., appellants.

No. 47597.

(Reported in 41 N.W.2d 658)

MARCH 7, 1950.

REHEARING DENIED MAY 5, 1950.

Pauline M. Kelley and Ries, Dutcher & Osmundson, all of Iowa City, for appellants.

D. C. Nolan and A. C. Cahill, both of Iowa City, and Robert Brooke and Harold Keele, both of West Liberty, for appellees.

MULRONEY, J.—This is an appeal from the second verdict and judgment setting aside the will of J. W. Ruess. For the opinion on the first appeal, which will serve as a general statement of the background of the case, see Ipsen v. Ruess, 239 Iowa 1376, 35 N.W.2d 82. The errors asserted by the proponents are grouped in their brief under three main divisions: (1) error in failing to direct the verdict for insufficiency of the evidence (2) error in admitting, and failing to strike, certain testimony of contestants' expert witness, and (3) error in the trial court's failure to submit certain requested interrogatories to the jury.

I. The evidence introduced in the second trial is about like the evidence which was introduced in the first, which latter evidence we held presented a conflict for the jury to decide.

(Ipsen v. Ruess, supra.) Four or five witnesses (neighbors and acquaintances) who testified for proponents in the first trial did not testify in the second, but eight or nine witnesses (neighbors and acquaintances) who testified in the second trial did not testify in the first. The contestants' testimony consisted almost entirely of a reading of the witness' testimony given on the first trial. We need not again review the testimony, especially since proponents' argument that the evidence was insufficient is based almost entirely on the exclusion of Dr. Andrew H. Woods' testimony, which, in the next division we hold was rightly admitted. Again we hold the evidence sufficient to warrant submission of the case to the jury.

II. The second error asserted is an attack upon the testimony of Dr. Woods, the medical expert who testified for contestants. The doctor had testified, in answer to a hypothetical question, that deceased was of unsound mind at the time he executed the will in May of 1942. Upon cross-examination the doctor said that "the matter of judgment, of making decisions, is the most important part" of a psychiatrist's examination as to mental competency, and the cross-examiner asked him: "So if he made judgments and decisions, in other words, if he made a will before you would know whether he was mentally competent or incompetent you would have to place that judgment that he exercised in making that will up against some other standard of judgment, isn't that right?" And the doctor replied: "The way it is done in practice is if there is a reason antecedent to his making of the will for knowing that he is mentally incompetent, then the making of the will would be precarious, and if asked if a man in such a position were in a position to make a complicated will, if I had reason to know in advance that he had a mental disease, that he was incompetent, then I would say that the validity of the will was highly questionable." The doctor went on to say that he did not know the "standard the law sets up" as to competency to make a will and that in saying Mr. Ruess was in his opinion mentally incompetent he had no intention of trying to state he was mentally incompetent "according to the standards set by law." The doctor also said a man in the condition of mental incompetency such as he said Mr. Ruess was in in 1942 might know the extent

of his property. He also said such a man might or might not know who his relatives were, but the fact that he was mentally incompetent (as he had described) would not necessarily prevent him from knowing who his relatives were. Finally the cross-examiner asked the doctor: "All I am trying to show is that when the court and the law speak of mental competency to make a will and when you are speaking of mental competency as you have testified, we may be talking about entirely different things, may we not?" And the doctor replied: "Very likely."

We are not faced with any problem as to correctness of the admission of the doctor's cross-examination testimony, for no objections were interposed. What plaintiff claims for the doctor's cross-examination here is that the doctor's cross-examination testimony compelled the striking of his earlier testimony, given on direct examination, that he was of the opinion deceased was of unsound mind. In their brief proponents argue: "Testamentary capacity is composed of the following elements: 1. Mind enough to know in a general way the natural objects of his bounty. 2. The nature and extent of his estate. 3. The distribution he wished to make of it. [In re Estate of Meyer, 240 Iowa 1226, 1234, 37 N.W.2d 265, 269.]" The argument is that the doctor's testimony shows that "his diagnosis was purely a medical one, divorced from legal concepts of the mental soundness required by law to make a will." In short, it is proponents' entire argument on this assigned error that the cross-examination made the doctor's opinion of mental unsoundness irrelevant, and the motion to strike the opinion testimony on that ground should have been sustained, citing In re Will of Hook, 189 Iowa 287, 290, 178 N.W. 357, 358, and State v. Knox, 236 Iowa 499, 18 N.W.2d 716; also Jones on Evidence, section 137. The last two authorities can only be of interest here because they state general rules as to relevancy of testimony. In In re Will of Hook we disregarded medical testimony that deceased was of unsound mind when it appeared it "was based, in part at least, upon the convenient theory that, inasmuch as he was bodily sick, he could not have been mentally sound." But no case is cited that holds that testimony of a medical diagnosis of mental unsoundness is not relevant to the issue of testamentary capacity. For a general rule as to relevancy of

734

testimony, we quote 1 Jones on Evidence, Fourth Ed., section 137, page 238, cited by proponents, where it is stated that "the question to be resolved is as to whether there is a logical or rational connection between the fact which is sought to be proved and a matter of fact which has been made an issue in the case."

■ Testamentary capacity is a mixed question of law and fact. Grismore v. Consolidated Products Co., 232 Iowa 328 at 361, 5 N.W.2d 646. That means that the law sets up the standard and the litigants introduce evidence of facts designed to prove whether or not the deceased measured up to that standard. Because mental capacity is a subject that is unfamiliar to the ordinary juror the courts permit opinion testimony by experts who are familiar with the general subject of mental capacity —the opinion to be based upon the evidence of facts. But the expert's opinion evidence must be confined to the field in which he is an expert. As stated in Adamson v. Burgle, Tex. Civ. App., 186 S.W.2d 388, 397: "* * * the expert in stating his opinions must be restricted to his particular field, which is limited by the superior knowledge, experience or education possessed by him as compared with that of the jury."

■ ■ In other words, the expert's opinion is a fact inference—a medical diagnosis that the consequences of the facts amount to a certain mental status. Whether that status would measure up to legal capacity or incapacity is for the jury to decide. But it is perfectly proper for the doctor to give his "opinion respecting the testator's ability to comprehend those concrete facts, the understanding of which is a legal requisite to the execution of a will." 32 C. J. S., Evidence, section 535, page 254. And his original opinion as an expert may be impaired or impeached by the testimony he later gives wherein he expresses his opinion as to the testator's ability to pass the legal tests of testamentary capacity. In 32 C. J. S., Evidence, section 571, the rule is stated:

"In general evidence may be introduced to impeach a skilled or expert witness or to lessen the weight of his expert opinion, or qualifications or retractions on the direct, cross, or redirect examination may be such as to impair its value; but qualifications by a witness of his testimony or isolated statements are

not necessarily sufficient to destroy the value of his testimony as a whole."

The cross-examination testimony of the doctor weakened his direct testimony of mental unsoundness by showing that the testator *might* (at one place the doctor said, *might or might not*) know the extent of his property and that he might or might not know who his relatives were, but his mental incompetence would not necessarily prevent him from knowing who his relatives were. But the doctor expressed no opinion as to whether the deceased had mind enough to know the distribution he wished to make of his estate. Besides, the word *might* given in the answers above denotes a possibility. The doctor's statements amounted to no more than that he was of the opinion that it was possible the deceased would know his property and relatives. Such a statement of opinion of possibility leaves open the question of the doctor's opinion as to probability as to whether the deceased would know his property or relatives. On the whole record we are of the opinion that the mental-unsoundness testimony was not entirely blacked out by the cross-examination, so as to be unable to throw any light on the issue of testamentary capacity and that the court did not commit error in refusing to strike the doctor's opinion of mental unsoundness on the ground of irrelevancy.

III. Proponents also argue Dr. Woods' answer to the hypothetical question to the effect that deceased was of unsound mind should have been stricken, for in answering that question the doctor was asked to assume the truth of certain evidence including a hospital record, Exhibit B. The doctor thought Dr. Wilbur R. Miller's statement of an examination he, Dr. Miller, made in 1941 was a part of the hospital record, Exhibit B. Actually the statement Dr. Woods read was a copy of Dr. Miller's testimony given in the case to the effect that: "He showed signs of generalized arteriosclerosis, with high blood pressure, arteriosclerosis of his peripheral blood vessels, the blood vessels in his retina were sclerosed." Dr. Woods' testimony shows he considered the condition of the retina in 1941, as stated by Dr. Miller, very significant as indicating the stage of arteriosclerosis present at and before the will was executed. The proponents' argument is that the doctor went outside the

limitations of the hypothetical question to get the evidence as to the retina of deceased's eyes. We think no prejudicial error occurred. The doctor did not go outside the record of testimony in the case. The matter was explained. Before Dr. Woods left the stand he stated: "Earlier in my testimony in referring to Exhibit 'B', I referred to examination of the retina of the eye. I have to clarify that statement. My information concerning the examination of the retina of the eye came from the court examination of Dr. Miller. I took the amplification by Dr. Miller as having come from the hospital record, but actually it came from his court examination."

. As having some bearing, see Quimby v. Greenhawk, 166 Md. 335, 338, 171 A. 59, 61, where the court said:

"* * * while the better practice is to incorporate in a hypothetical question all the facts on which an expert witness is asked to give an opinion, yet the hearing or reading of the testimony is accepted as an imperfect substitute for the formal hypothetical question in furnishing the data for inference by the expert witness."

See also 20 Am. Jur., Evidence, section 790, and 32 C. J. S., Evidence, section 554.

IV. Proponents submitted the following four special interrogatories: "1. Was J. W. Ruess on May 15, 1942 mentally competent to make a will? 2. Did J. W. Ruess on May 14, 1942 have mental capacity to know the extent of his property? 3. Did J. W. Ruess on May 15, 1942 have mental capacity to know and comprehend in a general way the natural objects of his bounty? 4. Did J. W. Ruess on May 15, 1942 have mental capacity to know the distribution of his estate that he wished to make?"

There was no error in the trial court's refusal to submit any of the above interrogatories. Rule 206, R. C. P., is in the language of the statute (section 11513, Code, 1939) it supersedes. It should be construed as in pari materia with rule 205, R. C. P., relating to special verdicts. Morbey v. Chicago & N. W. Ry. Co., 116 Iowa 84, 90, 89 N.W. 105, 107; Olinger v. Tiefenthaler, 226 Iowa 847, 285 N.W. 137. Rule 206, R. C. P., requires the trial court, when requested, to submit interrogatories

to require the jury "to find specially upon any particular questions of fact." It also provides: "If * * * any [answer] is inconsistent with the general verdict, the court may order judgment appropriate to the answers notwithstanding the verdict, or a new trial, or send the jury back for further deliberation." This last portion of the rule "necessarily implies that the question submitted shall be controlling." Morbey v. Chicago & N. W. Ry. Co., supra.

The right and duty to submit requested special interrogatories has been considered in a number of our cases. Many of our holdings are reviewed in King v. Chicago, R. I. & P. Ry. Co., 185 Iowa 1227, 1240, 172 N.W. 268, 272, where we said:

"It is apparent from these decisions that, regardless of how the language of the statute might have been construed, it has actually and uniformly been so construed as that, to constitute error in the refusal of a special interrogatory, it must have called for an ultimate fact, and an answer decisive of the case or of some claim involved therein. A large discretion is lodged in the trial court in the matter of submitting questions to the jury, even though omitting one or both of these elements; but we know of no case declaring that the refusal to submit an interrogatory not calling for an ultimate fact, or the answer to which would necessarily be decisive, has been regarded as an error. In the absence of prejudice, submission of interrogatories cannot well be denounced as erroneous. Error may be predicated only on the refusal of an interrogatory exacting an answer decisive of the case and calling for an ultimate fact."

In Johnson v. City of Denison, 186 Iowa 949, 957, 173 N.W. 46, 49, we said: "The court is not required to submit special interrogatories because of the mere asking. The interrogatories must involve some question which, answered affirmatively or negatively, is determinative of some ultimate fact involved in the right to recover."

But all authorities agree that it is only a question of fact that should be the subject of a special interrogatory. The first interrogatory here requested is a mixed question of fact and law. On the issue upon disputed facts of whether a person was mentally competent to make a will the entire question is for the jury—to decide, first, the fact dispute and, second, whether in

law the facts determined amount to testamentary capacity or incapacity as defined in the court's instructions. Of course, if there is no dispute in the facts or if they are subject to but a single inference the remaining question is one of law. But if a jury must first resolve the fact dispute and then apply the legal definition of testamentary capacity to the evidence of the testator's mental condition, it is, in its last function, deciding a question of law just as surely as the court decides a question of law when it applies the same legal definition to undisputed facts.

In In re Estate of Perkins, 195 Cal. 699, 710, 235 P. 45, 50, it was held: "The capacity of the testatrix to make a will is a mixed question of law and fact, to be decided by the jury under instructions of the court* * *."

In In re Estate of Sexton, 199 Cal. 759, 770, 251 P. 778, 782, it is said that the question of the capacity to make a will "is one of mixed law and fact, to be decided by the jury under proper instructions from the court as to what is the legal test of testamentary capacity." See also 57 Am. Jur., Wills, section 146.

Interrogatories calling for special findings upon questions of mixed law and fact are improper under a rule allowing interrogatories calling for special findings upon "any particular questions of fact." Brier Hill Steel Co. v. Ianakis, 93 Ohio St. 300, 303, 112 N.E. 1013; Haacke v. Lease, Ohio App., 41 N.E.2d 590; 64 C. J., Trial, section 931. In the Brier Hill Steel Company case the court stated:

"This interrogatory does not call for a special finding upon a *particular question of fact* as contemplated by such statutory provision, but rather for a combined finding of fact and conclusion of law, which conclusion may or may not be drawn from findings of particular facts returned by the jury, and therefore should not have been submitted by the trial court."

V.   The other three interrogatories fall with the first. They merely call for special findings as to evidentiary facts as distinguished from ultimate facts. Morbey v. Chicago & N. W. Ry. Co., supra; 64 C. J., Trial, section 930. Such interrogatories are particularly objectionable because by asking the jury as

to the legal tests of testamentary capacity they assume the jury must agree on their answers. If all jurors would answer any one of interrogatories 2, 3 or 4 in the negative—and not necessarily the same one—and the others in the affirmative, the general verdict to the effect that deceased lacked testamentary capacity would be sustained. In other words, the contestants, seeking to establish lack of testamentary capacity, present evidence of three facts, namely, that deceased did not have mental capacity: (1) sufficient to know the extent of his property (2) sufficient to know and comprehend in a general way the natural objects of his bounty, and (3) sufficient to know the distribution of his estate that he wished to make. Each, if proven, would independently establish lack of testamentary capacity. But the evidence to establish each of the three facts might appeal with different force to the jurors so that some might believe one was established and some might believe another was established. If the cumulative effect of all of the evidence is such as to leave no doubt in any juror's mind that at least one was established, then testamentary incapacity has been established even though there would not be unanimous concurrence in the findings as to the evidentiary facts. See Chicago & N. W. Ry. Co. v. Dunleavy, 129 Ill. 132, 144, 22 N.E. 15, 17, which is cited and quoted from in Morbey v. Chicago & N. W. Ry. Co., supra. Unanimity of the conclusion from the evidentiary facts is all that is required. As stated in Chicago & N. W. Ry. Co. v. Dunleavy, supra, and quoted in our opinion in the Morbey case:

"To require unanimity not only in their conclusions but in the mode by which those conclusions are arrived at would in most cases involve an impossibility. To require unanimity, therefore, not only in the result but also in each of the successive steps leading to such result, would be practically destructive of the entire system of jury trials."

We find no reversible error in the record, and the judgment appealed from is affirmed.—Affirmed.

HALE, OLIVER, WENNERSTRUM, SMITH, MANTZ, and HAYS, JJ., concur.