# IN THE SUPREME COURT OF IOWA

No. 17–1971

Filed October 25, 2019

**LARRY D. EISENHAUER,** Conservator, ex rel. **CONSERVATORSHIP OF T.D.,**

    Appellant,

vs.

**THE HENRY COUNTY HEALTH CENTER, JAMES WIDMER,** and **FAMILY MEDICINE OF MT. PLEASANT, P.C.,**

    Appellees.

---

Appeal from the Iowa District Court for Henry County, Mark Kruse, Judge.

Plaintiff appeals district court's entry of the jury verdict dismissing a medical malpractice case. **AFFIRMED.**

Jeffrey L. Goodman, Nicole L. Keller, and Daniel Peacock (until withdrawal) of Goodman Law, P.C., West Des Moines, and Michael J. Moreland of Harrison, Moreland, Webber & Simplot, P.C., Ottumwa, for appellant.

Jennifer E. Rinden, Robert D. Houghton, and Nancy J. Penner of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellee Henry County Health Center.

Robert V.P. Waterman Jr., Mikkie R. Schiltz, and Alexander C. Barnett of Lane & Waterman, LLP, Davenport, for appellees James Widmer and Family Medicine of Mt. Pleasant, P.C.

**CHRISTENSEN, Justice.**

This medical malpractice case concerns plaintiff's suit against defendants for negligent acts or omissions during plaintiff's birth. Defendants encountered the medical emergency of shoulder dystocia after plaintiff's shoulder became stuck on his mother's pelvis. Defendants performed maneuvers to resolve the stuck shoulder, but plaintiff was born with a permanent injury to his left arm preventing normal use and function. The jury returned a defense verdict and the district court dismissed plaintiff's claims. On direct appeal, we first consider whether the district court committed reversible error in the specifications of negligence it submitted to the jury. We also consider whether the district court abused its discretion when it prohibited plaintiff from offering evidence of defendants' continuing medical education credits. Next, we are asked to determine whether the district court properly admitted expert opinion testimony. Lastly, we determine whether limiting the jury's access to evidence during deliberations was within the district court's discretion.

For reasons expressed below, we conclude the plaintiff's proffered instructions were sufficiently encompassed by the instructions submitted or, in the alternative, were not supported by substantial evidence. We further conclude the district court did not abuse its discretion in prohibiting the plaintiff from introducing continuing medical education records to show a breach in the standard of care. However, although it was an abuse of discretion for the district court to prohibit the use of continuing medical education records as impeachment evidence, the error was harmless. Next, we determine defendants' expert opinion testimony was properly disclosed and did not reflect an opinion in anticipation of litigation. We further determine the district court did not abuse its

discretion in limiting the jury's access to video evidence during deliberation; it was a judgment call for the district court to make.

### I. Background Facts and Proceedings.

T.D. was born on August 31, 2007, at the Henry County Health Center (HCHC). Dr. Widmer, employed by Family Medicine of Mt. Pleasant, P.C.,[1] was the physician in charge of T.D.'s prenatal care and delivery. Many of the facts surrounding T.D.'s birth are not disputed. During the delivery, T.D.'s head delivered but his left shoulder became stuck on his mother's pelvis. This situation, a shoulder dystocia, is a medical emergency because the infant's delay in birth may cause severe brain damage or death if not resolved in six minutes or less. Dr. Widmer and the nurses performed maneuvers that resolved the shoulder dystocia in one minute and ten seconds. However, T.D. was born with a permanent injury to his left brachial plexus preventing normal use and function of his arm. T.D.'s delivery was captured on a twenty-one minute birth video recorded by T.D.'s aunt.

T.D., through a conservator,[2] filed a medical malpractice action on March 10, 2016, in Henry County alleging defendants were negligent during labor and delivery, causing injury. Nearly a year and a half later, T.D. filed a motion for leave to amend and substitute his original petition. Defendants resisted, citing concerns that T.D. was raising new claims of negligent training and credentialing for the first time less than sixty days before trial. On October 13, 2017, after an evidentiary hearing, the district

---

[1]We will refer to HCHC, Dr. Widmer, and Family Medicine of Mt. Pleasant, P.C. jointly as "defendants."

[2]T.D.'s mother, Lisa Hirschy, individually and as next friend of T.D., filed the original petition against the defendants. The original petition was later amended and substituted Hirschy with plaintiff "Larry Eisenhauer, Conservator, ex. rel. Conservatorship of [T.D.]" We will refer to the plaintiff simply as T.D.

court determined T.D.'s proposed amendment "that adds a new claim of negligent training does 'substantially change the issues or defenses of the case.' Allowing the amendment would prejudice the defense in this case." It ruled,

> The primary issues in this case remain as to what the applicable standard of care was on the date in question and whether there was a violation of this standard with a causal relationship to the injury.
>
> . . . .
>
> To the extent there may be any reference in the [a]mended [p]etition that relates to a theory of recovery based on negligent training or credentialing, the amendment is denied.

The district court later granted defendants' motion in limine relating to, among other things, any reference to either HCHC's training and credentialing process or Dr. Widmer's training as a family practice physician, including his Continuing Medical Education (CME) records.

Trial commenced on November 7, 2017, and concluded on November 17. Both parties offered expert testimony to support their respective positions. T.D. offered the birth video into evidence without objection. At the close of his case-in-chief, T.D. sought to admit Dr. Widmer's CME records and made on offer of proof. The district court affirmed its prior ruling and prohibited T.D. from offering evidence of the CME records.

During direct examination by defendants, Dr. Widmer testified:

> Q. Do you have an opinion as to whether the maneuvers you used were in conformity with the standard of care?
>
> MR. GOODMAN:  Undisclosed opinion.
>
> THE COURT:  Overruled.
>
> A.  I believe I did.

On the sixth day of trial, during redirect examination, Dr. Widmer referred to a single page of handwritten notes. He testified to creating the notes when he reviewed the birth video and stated his notes would assist in recalling the times he heard fetal heart rates without the need to watch the entire birth video. Defendants later moved to admit the notes as demonstrative evidence.

During deliberations, the jury asked to view the birth video, which was not submitted to the jury for deliberations. The district court complied with the request and played the video for the jury once in its entirety. Over plaintiff's objections, the birth video was not sent back to the jury room during deliberations but could be viewed an additional time upon request by the jury. Such a request was made and the video was again played in its entirety. Subsequently, the jury returned a verdict for defendants, finding neither HCHC's nurses nor Dr. Widmer were negligent. Consequently, the jury did not reach the question of causation or damages.

The district court, based upon the jury's verdict, entered an order dismissing T.D.'s claims. T.D. appealed the district court order, and we retained the appeal.

## II. Standard of Review.

The standard of review for jury instructions is for prejudicial error by the district court. *Thavenet v. Davis*, 589 N.W.2d 233, 236 (Iowa 1999) (en banc). Therefore, a district court's refusal to give a requested jury instruction is reviewed for correction of errors at law. *See Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016). "Instructions must be considered as a whole, and if the jury has not been misled there is no reversible error." *Thavenet*, 589 N.W.2d at 236. "In considering whether the instruction is supported by substantial evidence, we give the evidence

the most favorable construction it will bear in favor of supporting the instruction." *Asher v. OB–Gyn Specialists, P.C.*, 846 N.W.2d 492, 496–97 (Iowa 2014), *overruled by Alcala*, 880 N.W.2d at 707–08, 708 n.3.

A district court's decision to admit relevant evidence is reviewed for an abuse of discretion. *See Mohammed v. Otoadese*, 738 N.W.2d 628, 631 (Iowa 2007). "An abuse of discretion occurs when 'the court exercise[s] [its] discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000) (en banc) (alteration in original) (quoting *Waits v. United Fire & Cas. Co.*, 572 N.W.2d 565, 569 (Iowa 1997)). Grounds or reasons are clearly untenable if they are not supported by substantial evidence or if they are based on an erroneous application of law. *Id.* "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ." Iowa R. Evid. 5.103(*a*).

We review whether a district court properly admitted expert testimony for abuse of discretion. *See Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 479 (Iowa 2004).

Similarly, "[s]ubmission of exhibits to the jury is a matter resting in [the] trial court's discretion." *Brooks v. Holtz*, 661 N.W.2d 526, 532 (Iowa 2003) (alteration in original) (quoting *Heth v. Iowa City*, 206 N.W.2d 299, 303 (Iowa 1973)).

**III. Analysis.**

**A. Specifications of Negligence.** We first consider whether there was reversible error in the district court's specifications of negligence. In a medical malpractice action, "a plaintiff must produce evidence that (1) establishes the applicable standard of care, (2) demonstrates a violation of this standard, and (3) develops a causal relationship between the violation and the injury sustained." *Oswald v. LeGrand*, 453 N.W.2d 634, 635 (Iowa

1990). The questions respecting the violation of a standard of care and the causal relationship are ordinarily for the trier of fact. *See Speed v. State*, 240 N.W.2d 901, 904 (Iowa 1976).

A plaintiff is required to identify the specific acts or omissions relied upon to generate questions for the trier of fact. *See Herbst v. State*, 616 N.W.2d 582, 585 (2000) (en banc). As we explained in *Herbst*, "Jury instructions should be formulated so as to require the jury to focus on each specification of negligence that finds support in the evidence." *Id.* (quoting *Bigalk v. Bigalk*, 540 N.W.2d 247, 249 (Iowa 1995)). Put another way, a party is entitled to have its legal theory submitted to the jury if that theory is supported by substantial evidence. *See Ludman v. Davenport Assumption High Sch.*, 895 N.W.2d 902, 919–20 (Iowa 2017).

Of course, whether a jury instruction sufficiently encompasses each specification of negligence alleged by a plaintiff is determined by the facts of the particular case. *See Herbst*, 616 N.W.2d at 586. Iowa law requires a court give a requested instruction as long as the instruction is a correct statement of law, is applicable to the case, and is not otherwise embodied elsewhere in the instructions. *See Ludman*, 895 N.W.2d at 919; *Porter v. Iowa Power & Light Co.*, 217 N.W.2d 221, 234 (Iowa 1974). This principle, however, does not require a court give instructions that provide undue emphasis to any particular aspect of the case, *Burkhalter v. Burkhalter*, 841 N.W.2d 93, 106 (Iowa 2013), or that duplicate specifications adequately encompassed elsewhere in the instructions, *Porter*, 217 N.W.2d at 233–34.

T.D. challenges the manner in which the district court instructed the jury on his specific claims of negligence. Regarding Dr. Widmer, T.D. proposed the following instruction with six subparts:

Dr. Widmer was negligent by failing to meet the standard of care in the following way:

> a. Repeatedly directing [mother] to push after shoulder dystocia was identified and traction failed to deliver the stuck shoulder;
>
> or
>
> b. Applying improper traction to [T.D.]'s head or neck during the delivery;
>
> or
>
> c. Failing to properly and effectively supervise, direct, or coordinate the efforts of the delivery team;
>
> or
>
> d. Mistakenly concluding that [T.D.] was experiencing bradycardia and as a result, delivering [T.D.] hastily and without due care;
>
> or
>
> e. Failing to follow the HCHC policy on Shoulder Dystocia, or Vacuum Extraction, or Pitocin;
>
> or
>
> f. Failing to properly and effectively use maternal and fetal maneuvers to safely deliver [T.D.] after shoulder dystocia occurred, including, but not limited to: McRoberts maneuver, suprapubic pressure, Wood's screw, reverse Wood['s] screw (Rubin's), delivering the posterior arm, and Gaskin's maneuver;

The district court whittled down T.D.'s proposed specifications about Dr. Widmer and instructed the jury on the following specifications of negligence:

> Dr. Widmer was negligent by failing to meet the standard of care in one or more of the following ways:
>
> (a) in failing to direct or coordinate proper maneuvers to deliver the baby after the recognition of shoulder dystocia;

(b) by applying excessive or improper traction in an effort to deliver him after the recognition of shoulder dystocia;

Regarding the nurses, T.D. proposed the following instruction with five subparts:

Either nurse or both Rebecca Fraise, R.N. and Yvonne Sloan, R.N. were negligent by failing to meet the standard of care in the following way:

a. Repeatedly directing [mother] to push after shoulder dystocia was identified and traction failed to deliver the stuck shoulder;

or

b. Failing to follow the HCHC policy on Shoulder Dystocia or Pitocin;

or

c. Failing to properly and effectively perform the McRoberts maneuver and suprapubic pressure, to safely deliver [T.D.] after shoulder dystocia occurred[;]

or

d. Acting without due care in delivering [T.D.];

or

e. Failing to call for help;

The district court whittled down T.D.'s proposed specifications about the nurses and instructed the jury on the following specifications of negligence:

That either of the nurses was negligent by failing to meet the standard of care in the following way:

(a) in the performance of the McRobert[s] maneuver and/or the application of suprapubic pressure.

T.D. asserts the districts court's instructions failed to instruct the jury on certain acts or omissions in which defendants violated the

standard of care. Specifically, T.D. claims the district court failed to incorporate the following specifications of negligence against Dr. Widmer: (1) directing to push after shoulder dystocia was identified, (2) failing to properly and effectively direct the delivery team as well as failing to properly and effectively use maternal and fetal maneuvers, and (3) mistakenly concluding T.D. was experiencing bradycardia. With respect to the HCHC nurses, T.D. claims the district court failed to incorporate two specifications of negligence: (1) directing to push after shoulder dystocia was identified, and (2) failing to properly and effectively perform maternal maneuvers.

Defendants argue that T.D.'s proffered specifications of negligence were adequately embodied in the court's final jury instructions, and because the more general language allowed T.D. to emphasize his proffered specifications of negligence throughout his trial presentation, the district court's refusal to provide instructions on specific acts or omissions was not prejudicial.

T.D.'s proposed instructions indicated Dr. Widmer and the HCHC nurses failed to meet the standard of care by "[r]epeatedly directing [mother] to push after shoulder dystocia was identified and traction failed to deliver the stuck shoulder." This theory found support in the testimony of each party's expert, which revealed all commands to push and tractional efforts should cease when shoulder dystocia is first recognized. The experts also agreed maternal maneuvers, such as the McRoberts maneuver,[3] should be executed to relieve shoulder dystocia. Once the McRoberts maneuver is implemented, pushing and tractional forces are allowed to resume. Arguably, a breach of the standard of care could occur

---

[3]The McRoberts maneuver is a nurse performed maneuver that raises the mother's legs to her chest in order to resolve shoulder dystocia.

if commands to push and tractional efforts occurred *after* dystocia was recognized but *before* the McRoberts maneuver was implemented.

We think the specific act or omission of repeatedly directing to push was adequately encompassed in the district court's instructions. The district court's specifications stated Dr. Widmer was negligent by "failing to direct or coordinate proper maneuvers" and "applying excessive or improper traction . . . after the recognition of shoulder dystocia." These instructions are directly related to the concept of "directing to push." The record indicates it was Dr. Widmer's responsibility to communicate with the delivery team and it was his responsibility to coordinate maternal maneuvers. Any direction by Dr. Widmer to push after shoulder dystocia was recognized but before the McRoberts maneuver was implemented falls squarely within his failure to direct or coordinate the proper maneuver and could result in improper traction. The district court's instructions adequately instructed the jury on each alleged act or omission.

The same is also true for the HCHC nurses. Failing to meet the standard of care "in the performance of the McRobert[s] maneuver" encompassed "directing to push" after the recognition of shoulder dystocia. Indeed, HCHC nurses could fail to meet the standard of care if they directed the mother to push after the recognition of shoulder dystocia but before implementation of the McRoberts maneuver—a direction that is contrary to the performance of the maneuver as established in the record.

Moreover, the district court illustrated the difficulty that a separate instruction on "directing to push" would create in conjunction with an instruction regarding the proper maneuver to deliver T.D.

> I mean, you can't say stop pushing and just sit there the rest of the day. At some point you have to start pushing again. I think that was the testimony of all the experts. I mean, you can't just stop and lollygag around. At some point somebody has to push again.

We agree with its reasoning. Directions to intermittently start and stop pushing at certain points in the delivery process are part of the proper maneuver. This is supported by the testimony of each party's expert. Therefore, the district court's jury instructions adequately encompassed T.D.'s specifications of negligence. *See Porter*, 217 N.W.2d at 233.

T.D.'s proposed instructions also drew a distinction between maternal and fetal maneuvers. It was T.D.'s theory that HCHC nurses failed to properly and effectively perform the maternal maneuver (McRoberts maneuver and suprapubic pressure[4]), that Dr. Widmer failed to properly and effectively supervise the delivery team, and that Dr. Widmer failed to properly and effectively use fetal maneuvers. When faced with an improper and ineffective maternal maneuver, T.D.'s expert indicated it was Dr. Widmer's responsibility to direct the proper and effective performance of the maternal maneuver. If the proper and effective maternal maneuver failed to release the shoulder dystocia, then Dr. Widmer should have moved on to other fetal maneuvers (physician-applied maneuvers).

We conclude the district court's instructions adequately encompassed T.D.'s legal theories of negligence. To begin, both parties' experts agreed maternal maneuvers are performed by nurses. Even T.D. concedes "the HCHC nurses attempted the proper maternal maneuvers— McRobert[s] and suprapubic pressure." Yet, T.D. asserts the district court's exclusion of "proper and effective" conveyed only a specification of whether the HCHC nurses conducted the proper maneuver, not whether it was effective. This exclusion, we believe, was fully encompassed in the instruction submitted. The district court's instruction begins by

[4]Suprapubic pressure is a nurse applied maneuver that pushes down on the mother's pubic bone to resolve shoulder dystocia.

explaining that HCHC nurses are negligent if they fail to meet the standard of care during the performance or application of a maternal maneuver. We are convinced a negligent performance or application of a maternal maneuver sufficiently encompassed an act that would violate the standard of care, i.e, inadequate or ineffective. The district court "need not adopt the form requested by a party." *Schuller v. Hy-Vee Food Stores, Inc.*, 328 N.W.2d 328, 332 (Iowa 1982).

A similar analysis is appropriate for Dr. Widmer's specifications. T.D.'s proposed instructions sought to distinguish two different acts or omissions: (1) Dr. Widmer's failure to supervise maternal maneuvers and (2) Dr. Widmer's failure to use fetal maneuvers. We conclude the district court's instruction sufficiently highlighted two distinct acts or omissions. First, unlike the court's instruction for the HCHC nurses' specification, Dr. Widmer's instruction was not narrowed to the maternal maneuvers (McRoberts and suprapubic pressure). Quite the opposite. It set forth his duty to "direct or coordinate proper maneuvers." We read this two-fold specification to include multiple maneuvers, if necessary.

Second, the district court's specification reflected the sequential nature of proper maneuvers, as expressed by the parties' expert testimony. If shoulder dystocia is encountered during the delivery, it is the physician's responsibility to direct the proper maternal maneuver. If the proper maternal maneuver does not resolve the shoulder dystocia, the physician should coordinate a number of fetal maneuvers. The record indicates maternal maneuvers are nurse applied, in contrast to fetal maneuvers, which are physician applied. T.D. presented significant evidence reviewing fetal maneuvers and their proper use.

T.D. argues the district court's use of "direct or coordinate" limited Dr. Widmer's liability to maternal maneuvers because "direct or

coordinate" each refer to controlling or managing others. However, read in the context of the two-fold specification, we disagree. Dr. Widmer's negligence may have stemmed from his failure to direct maternal maneuvers or from his failure to coordinate fetal maneuvers. *Compare Direct*, *Webster's Third New International Dictionary* (unabr. 2002) ("[T]o dedicate to a person[,] . . . to dispatch, aim, or guide usu. along a fixed path"), *with Coordinate*, *Webster's Third New International Dictionary* ("[T]o bring into a common action, movement, or condition **:** regulate and combine in a harmonious action"). With respect to the district court's exclusion of "effective," we are again convinced the standard of care implies effective direction or coordination.

Whether Dr. Widmer was negligent for his failure to direct or coordinate proper maneuvers was a question for the jury. We believe the district court's instruction sufficiently advised the jury of specific acts or omissions related to maternal and fetal maneuvers.

T.D. also argues that the district court erred in its refusal to provide T.D.'s specification of negligence regarding Dr. Widmer's assessment of bradycardia:

> (d) Mistakenly concluding that [T.D.] was experiencing bradycardia and as a result, delivering [T.D.] hastily and without due care;

The record indicates bradycardia occurs when the fetal heart rate remains below 110 beats per minute for a full ten-minute period. When bradycardia occurs, there is a danger the fetus will be deprived of oxygen and suffer a brain injury. A more severe bradycardia will result in less time for a physician to complete delivery.

Defendants argue the evidence is insufficient to support T.D.'s specification of negligence. If substantial evidence in the record supports

T.D.'s legal theory concerning bradycardia, he is entitled to submit that theory to the jury. *See Lundman*, 895 N.W.2d at 919–20. "Evidence is substantial enough to support a requested instruction when a reasonable mind would accept it as adequate to reach a conclusion." *Id.* at 920 (quoting *Beyer v. Todd*, 601 N.W.2d 35, 38 (Iowa 1999)). "[W]e give the evidence the most favorable construction it will bear in favor of supporting the instruction." *Asher*, 846 N.W.2d at 496–97.

Applying this favorable construction, we determine a reasonable mind would not accept the evidence as adequate to conclude there was no bradycardia. Dr. Widmer testified T.D.'s heart rate lowered to eighty beats per minute, which revealed T.D. "was having some distress." In Dr. Widmer's opinion, T.D. was experiencing late deceleration following his mother's push and contraction, and "[t]hat's usually a sign that the baby is not doing well." In T.D.'s circumstances, the late deceleration kept his heart rate down in the eighty beats-per-minute range. Further, T.D.'s own expert testified it was impossible to determine whether Dr. Widmer misdiagnosed bradycardia because the fetal heart rate charts only reflected T.D.'s heart rate every five minutes. He stated,

> [W]e really don't know what the care showed, other than nursing charts that every five minutes heart rate 80's to 90's, 90 to a hundred, but it doesn't tell you what it is minute to minute to minute, so we don't know if these are what we call variable decelerations . . . . So it may have been indicated, it may not have been. *I don't think there's enough information there in the record to tell you.*

(Emphasis added.) The record contains insufficient evidence to support the legal theory that Dr. Widmer mistakenly concluded T.D. was experiencing bradycardia. We conclude the district court did not err in refusing T.D.'s specification of negligence.

T.D. next contends Iowa caselaw is clear on the specification issue: jury instructions must include each specification of negligence that finds support in the evidence. Caselaw in the form of premises liability provides relevant rules of proper jury instructions.

"The court is entitled to choose its own language in submitting an issue and need not adopt the form requested by a party." *Schuller*, 328 N.W.2d at 332. That was the rule expressed by our court in *Schuller* after we determined the jury instructions adequately incorporated plaintiff's specifications of negligence. *See id.* There, Schuller was injured after tripping over an ashtray canister as he entered the aisle in defendant's grocery store. *Id.* at 330. He sought four specifications of negligence against the grocery store: "blocking an aisle by placing an ashtray where a customer was expected to walk, placing an ashtray in a concealed location, failing to place the ashtray in a safe location, and failing to warn of the ashtray's location." *Id.* at 331–32.

The district court only submitted instructions concerning whether the grocery store was negligent "in placing the ashtray stand in an aisle where customers were expected to walk" and circumstances that would give rise to a duty to warn. *Id.* at 332. We concluded Schuller's first three specifications of negligence related to the concept of ashtray placement, which was adequately incorporated in the single specification submitted. *See id.*

In *Bigalk,* our court addressed the issue of whether a plaintiff was entitled to have the jury instructed on each alleged act or omission. 540 N.W.2d at 248. After falling into an unguarded stairwell, Bigalk brought a personal injury claim against the property owner. *Id.* Her theory was, as a possessor of land, the property owner owed a duty under Restatement (Second) of Torts. *Id.*

Bigalk claimed the property owner was negligent in failing to warn of the danger, failing to provide adequate lighting, failing to cover the open stairwell, and failing to provide a railing around the stairwell. *Id.* at 248–49. The district court limited the specifications of negligence and instructed the jury, "The Defendant was negligent in failing to make the condition (open stairway) safe or in failing to warn the Plaintiff of the condition and risk involved." *Id.* at 249. Bigalk objected on the ground that, apart from the warning language, the instructions did not advise the jury concerning the specific acts or omissions she claims were negligent conduct. *Id.* at 249. On appeal, we reversed the district court. *Id.* at 250. We said, "[Bigalk] was entitled to have the jury instructed in the present case concerning each alleged act or omission that found support in the evidence." *Id.*

We later contrasted *Schuller* with *Bigalk* in *Herbst,* 616 N.W.2d 582. The narrow question in *Herbst* was whether the district court adequately instructed the jury concerning specifications of negligence. *Id.* at 585. We identified two issues with the instructions given in *Herbst.* *Id.* at 587. First, the district court did not adequately instruct the jury concerning defendant's negligent act. *Id.* Second, the jury was not adequately instructed concerning Herbst's theory of defendant's negligent omission. *Id.*

Herbst sustained injuries while descending from a stage in a university rehearsal hall. *Id.* at 583. It was her theory that the university was negligent by (1) "permitting makeshift stairs to be used," (2) "failing to provide a safe and secure set of stairs," and (3) "failing to provide unimpeded access to the permanent stairs." *Id.* at 586. The district court instructed the specification of negligence as "failing to provide safe and secure access onto the stage." *Id.* at 586–87.

We concluded the instruction did not adequately instruct the jury concerning each alleged act (permitting makeshift stairs to be used) or omission (failing to provide safe and secure access). *See id.* at 587. We determined Herbst's third specification of negligence (failing to provide unimpeded access) was to be encompassed in the first two instructions. *See id.*

Upon our review, we determine the jury was adequately instructed concerning T.D.'s specifications of negligence. Viewed as a whole, the district court's instructions ensured the jury would give consideration to each alleged act or omission. In *Bigalk* and *Herbst*, the standard of care was simply repeated to the jury. Like *Schuller*, the district court's instructions in this case related to the concept of specific acts or omissions during the delivery of T.D. and sufficiently encompassed T.D.'s specifications of negligence.

We need not reach T.D.'s claim of prejudice given our holding on the manner in which the district court instructed the jury. "An error in giving an instruction 'does not warrant reversal unless the error is prejudicial to a party.'" *Asher,* 846 N.W.2d at 496 (quoting *Herbst,* 616 N.W.2d at 585). "Prejudice results when the trial court's instruction materially misstates the law, confuses or misleads the jury, or is unduly emphasized." *Anderson v. Webster City Cmty. Sch. Dist.,* 620 N.W.2d 263, 268 (Iowa 2000) (en banc). In any event, T.D. was free to emphasize, and did emphasize, that his proffered specifications of negligence breached the standard of care. By his own admissions, T.D. indicated he emphasized his specifications of negligence throughout his opening, case-in-chief, and closing. While discussing the proffered instructions with the parties, the district court even encouraged T.D. to argue his specifications: "You can argue that point, that's fine. You can argue that all you want, and that's

fine . . . ." T.D.'s presentation of his legal theory, in conjunction with the instructions as a whole, properly explained the relevant law to the jury. *See id.* ("In this case, all the instructions when read together properly explained the applicable law to the jury."). We conclude the district court fulfilled its "duty to see that a jury has a clear and intelligent understanding of what it is to decide." *Sonnek v. Warren*, 522 N.W.2d 45, 47 (Iowa 1994).

**B. Training and Medical Education.** The district court prohibited T.D. from offering evidence of Dr. Widmer's CME records. T.D. contends, as he did in the district court, that Dr. Widmer's training and medical education records were admissible. The CMEs were admissible, T.D. argues, because (1) the records were relevant to show a breach in the standard of care and (2) he was entitled to introduce impeachment evidence that lessened the weight of Dr. Widmer's expert opinion. We disagree with T.D.'s contention regarding the relevancy of CME records to show a breach in the standard of care, but we agree that he was entitled to introduce CME records for impeachment purposes. However, we affirm the district court's decision because the erroneous ruling did not affect T.D.'s substantial rights. *See* Iowa R. Evid. 5.103(*a*).

The procedural background surrounding Dr. Widmer's CME records offers insight to the district court's ruling. A year and a half after T.D. filed his petition in district court, he filed a motion for leave to amend and substitute the original petition. Defendants resisted, citing concerns that T.D. was raising new claims of negligent training and credentialing for the first time less than sixty days before trial. The district court denied T.D.'s motion. The order stated, "It is clear that what the [p]laintiff is asking for is the inclusion of a claim of negligent training." It concluded the proposed amendment, which added a new claim of negligent training, would

substantially change the issues or defenses of the case.  The district court

ruled:

> The primary issues in this case remain as to what the applicable standard of care was on the date in question and whether there was a violation of this standard with a causal relationship to the injury.
>
> . . . .
>
> To the extent there may be any reference in the [a]mended [p]etition that relates to a theory of recovery based on negligent training or credentialing, the amendment is denied.

The district court later granted defendants' joint motion in limine

regarding any reference to HCHC's training and credentialing process and

any reference to or evidence concerning Dr. Widmer's training as a family

practice physician, including Dr. Widmer's CME records.[5]  At the close of

his case-in-chief, T.D. again sought to admit Dr. Widmer's CME records.

The district court maintained the same ruling, which excluded the records.

---

[5]In passing, T.D.'s brief asserts the district court abused its discretion by granting overly broad motions in limine.  He points to, as an example, the motions in limine regarding HCHC's training and credentialing process and Dr. Widmer's CME records.  We have stated,

> The function of a motion in limine is not only to exclude during the voir dire examination and opening statements, reference to anticipated evidence claimed to be objectionable because of incompetent, irrelevant, immaterial or privileged but to also restrict opposing counsel in asking questions or making statements in offering such matters until the admissibility of the questionable evidence can be determined during the course of the trial by presenting to the court in the absence of the jury such evidence by offer and objection.  Its objective is to control such matters in advance and thus avoid disclosing to the jury prejudicial material which may compel declaring a mistrial.

*Twyford v. Weber*, 220 N.W.2d 919, 922–23 (Iowa 1974).  Here, the district court did not abuse its discretion by granting the motions in limine.  Any reference to negligent training or credentialing would be a new claim prejudicial to the defense, as previously determined by the district court.  It was appropriate to grant the motions in limine until the admissibility of the evidence was determined by offer of proof.  *Id.* at 923.

Defendants claim T.D. failed to preserve error on the admissibility of Dr. Widmer's CME records. "If the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." *Id.* r. 5.103(*a*)(2). In this case, T.D. made the following offer of proof:

> It's a long-standing rule in Iowa that evidence may be introduced to impeach an expert witness or to lessen the weight of his expert opinion or qualifications. . . . And since we know Dr. Widmer will testify as an expert witness, it's Plaintiff's position that we're entitled to introduce evidence that will lessen the weight of his opinion and also to raise doubts about the quality of his expertise.

> Dr. Widmer's CME records are relevant and admissible for this purpose. Even had Dr. Widmer not been designated as an expert witness, this evidence is relevant to call into question the professional judgment he exercised in the delivery of [T.D.] and also the expected testimony . . . to give in his defense that he—he did not need more than two maneuvers. . . .

T.D. concluded his offer of proof by providing the court with Dr. Widmer's CME records, a collection of discovery relevant to the CMEs, and a breakdown of the type of CMEs Dr. Widmer obtained.

"The purpose of an offer of proof is to give the trial court a more adequate basis for its evidentiary ruling and to make a meaningful record for appellate review . . . ." *State v. Ritchison*, 223 N.W.2d 207, 212 (Iowa 1974). We conclude T.D.'s offer of proof provided the district court with an adequate basis and provided our court with a meaningful record for review. It is clear T.D. sought to introduce CME records to show a breach in Dr. Widmer's standard of care and to lessen the weight of his expert opinion.

We now turn to the merits of T.D.'s claim. Relevant evidence is admissible, unless provided otherwise. *See* Iowa R. Evid. 5.402. However, "[i]rrelevant evidence is not admissible." *Id.* Evidence is relevant if "[i]t

has any tendency to make a fact more or less probable than it would be without the evidence; and . . . [t]he fact is of consequence in determining the action." *Id.* r. 5.401.

1. *CME records to show breach in the standard of care.* "A physician is liable for injury to a patient caused by failure of the physician to apply that degree of skill, care, and learning ordinarily possessed and exercised by other physicians in similar circumstances." *Speed*, 240 N.W.2d at 904. In other words, "[a] physician owes a duty to his patient to exercise the ordinary knowledge and skill of his or her profession" when providing care and treatment. *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 260 (Iowa 1999). Dr. Widmer thus owed a duty to exercise "the ordinary knowledge and skill" of his profession during T.D.'s delivery, and if that standard was violated, he is liable for injuries. *See id.* The question becomes whether Dr. Widmer's CME records have a tendency to make a fact, that is of consequence to his outlined duty, more or less probable. *See* Iowa R. Evid. 5.401.

T.D.'s brief reviewed the general purpose of CME credits and canvased Iowa's requirements of CME hours for physicians. According to T.D.'s calculation, Dr. Widmer's CME records show, out of approximately four hundred hours of CME credits during the relevant timeframe, only eight hours were potentially related to obstetrics. Obstetrics accounted for less than two percent of his overall CME credits, although obstetrics accounted for five to ten percent of his overall practice. T.D.'s theory concludes Dr. Widmer's lack of CME credit hours in obstetrics demonstrates he did not possess the same degree of skill, care, and learning as other physicians in similar circumstances.

We are not convinced Dr. Widmer's CME records make such bold statements. This evidence simply reflects the fact that Dr. Widmer has

discretion in the type and amount of credit hours selected. No evidence was produced in T.D.'s offer of proof recognizing the type and amount of CMEs obtained by similarly situated doctors. More importantly, Dr. Widmer's type and amount of credit hours are inconsequential in determining T.D.'s action—whether Dr. Widmer violated his standard of care on the day he delivered T.D. We conclude Dr. Widmer's CME records are irrelevant to show a breach in that standard of care. Therefore, the district court did not abuse its discretion.

2. *CME records for impeachment.* We must next address whether Dr. Widmer's CME records were admissible as impeachment evidence. Ordinarily, impeachment evidence is admissible if it is relevant to undermining the credibility of the witness being impeached. *See State v. Turecek*, 456 N.W.2d 219, 224 (Iowa 1990). In the case of an expert witness, evidence may be introduced "to lessen the weight of his expert opinion." *Ipsen v. Ruess*, 241 Iowa 730, 734, 41 N.W.2d 658, 661 (1950) (quoting 32 C.J.S. *Evidence* § 571 (now found at 32A C.J.S. *Evidence* § 996, at 78 (2008))).

Dr. Widmer testified, in his expert opinion, the maternal maneuvers he used to deliver T.D. met the standard of care. T.D. asserts the CME records would have weakened Dr. Widmer's credibility as an expert and he was entitled to introduce the impeachment evidence.

Defendants compare this issue to *Campbell v. Vinjamuri*, 19 F.3d 1274 (8th Cir. 1994), and argue Dr. Widmer's CME records were properly excluded. We think this case is distinguishable. *Campbell* involved similar impeachment evidence during a medical malpractice trial. The deposition of Dr. Vinjamuri revealed "he was not board certified in anesthesiology as he had, on three or four occasions, failed the board certifying examination." *Id.* at 1267. The district court found the board failures

irrelevant and inadmissible, but evidence that Dr. Vinjamuri was not board certified was allowed to go before the jury. *Id.* On cross-examination, Campbell sought to use Dr. Vinjamuri's test failures to impeach his credibility as an expert, but the district court refused. *Id.*

The United States Court of Appeals for the Eighth Circuit affirmed on appeal. *Id.* at 1278. However, unlike Dr. Widmer, Dr. Vinjamuri gave what was classified as limited expert testimony and the court did "not decide whether a different result would be warranted had Vinjamuri given more extensive expert testimony." *Id.* at 1277 & n.2. The court reasoned Vinjamuri's test failures had no connection to whether he met the standard of care in his treatment. *Id.* at 1277. His reason for the lack of certification was deemed of limited significance, but as the court pointed out "[i]t [was] sufficient that the jury was given the information that Vinjamuri was not board certified in his specialty." *Id.*

In contrast to Dr. Vinjamuri's limited expert testimony in *Campbell,* Dr. Widmer was designated as an expert and provided his expert opinion testimony. Further, evidence that Dr. Vinjamari was not board certified was before the jury and that evidence was found to be sufficient. The same is not true for Dr. Widmer; there is no evidence before the jury concerning the type and amount of his CME credits. T.D. does not seek to impeach Dr. Widmer with evidence of the reason for his limited CME credits in obstetrics. He seeks to introduce impeachment evidence as a way of informing the jury that Dr. Widmer has limited CME credits in obstetrics. We are not inclined to reach the same conclusion as the Eighth Circuit in *Campbell.*

We agree with T.D.'s argument that the district court should have allowed Dr. Widmer's CMEs to be used for impeachment purposes. The cross-examination of Dr. Widmer with his own CME records may have

lessened the weight of his expert opinion. *See Ipsen*, 241 Iowa at 734, 41 N.W.2d at 661; *see also Heinz v. Heinz*, 653 N.W.2d 334, 342 (Iowa 2002) ("The purpose of cross-examination is to test the veracity of statements a witness made and to weaken or disprove the opposing case."). The CME records would have shown the jury that Dr. Widmer committed relatively few hours of his continuing medical education to obstetrics. Therefore, the CME records were relevant to undermining the credibility of Dr. Widmer and were admissible as impeachment evidence on this narrow issue. *See Turecek*, 456 N.W.2d at 224.

We must next determine whether reversible error was committed by the omission of this evidence. Error in excluding evidence may be claimed "only if exclusion of the evidence affected a party's substantial rights." *Scott v. Dutton-Lainson Co.*, 774 N.W.2d 501, 503 (Iowa 2009); *see* Iowa R. Evid. 5.103(*a*). Reversal is warranted only if the exclusion of Dr. Widmer's CME records affected T.D.'s substantial rights. *See Scott*, 774 N.W.2d at 503. Because we are dealing with a nonconstitutional error, we employ the harmless error analysis. *See State v. Russell*, 893 N.W.2d 307, 314 (Iowa 2017). "We presume prejudice and reverse unless the record affirmatively establishes otherwise." *Id.*

Upon our review of the record, we conclude the error was harmless. The district court's exclusion of the CME records did not affect T.D.'s substantial rights. At trial, T.D. was able to introduce other evidence concerning Dr. Widmer's training and lack of experience, which lessened the weight of his expert opinion. T.D.'s expert testified to the proper use of maternal and fetal maneuvers when shoulder dystocia is encountered. His expert specifically stated Dr. Widmer did not possess the knowledge and experience of proper maneuvers and that Dr. Widmer "didn't ever have a prior experience" with fetal maneuvers. T.D. also played the deposition

of Dr. Widmer for the jury. The deposition elicited from Dr. Widmer the fact he could not recall attending any seminars or practice review courses specific to obstetrics. On cross-examination, Dr. Widmer admitted to not knowing multiple types of fetal maneuvers. In fact, Dr. Widmer testified he had never performed a number of relevant fetal maneuvers used to resolve shoulder dystocia. We conclude this evidence, in addition to the opinions of many experts over the eight-day trial, weakened the credibility of Dr. Widmer's expert opinion.

The record affirmatively established the exclusion of Dr. Widmer's CME records did not affect T.D.'s substantial rights. There is no error warranting reversal in this case. *See Tucker v. Caterpillar, Inc.*, 564 N.W.2d 410, 414 (Iowa 1997).

**C. Undisclosed Expert Opinions.**

1. *Direct testimony.* At trial, Dr. Widmer testified on direct examination:

> Q. Do you have an opinion as to whether the maneuvers you used were in conformity with the standard of care?
>
> MR. GOODMAN: Undisclosed opinion.
>
> THE COURT: Overruled.
>
> A. I believe I did.

T.D. contends this four-word standard of care opinion required prior disclosure, which Dr. Widmer failed to do, and the district court erred by allowing him to testify. We consider T.D.'s argument against this backdrop.

Iowa Code chapter 688 contains a provision governing the "[d]isclosure of expert witnesses in liability cases involving licensed professionals" and states,

> A party in a professional liability case brought against a licensed professional pursuant to this chapter who intends to call an expert witness of their own selection, shall certify to the court and all other parties the expert's name, qualifications and the purpose for calling the expert . . . .

Iowa Code § 668.11(1) (2017). The parties do not dispute the timeliness of Dr. Widmer's designation pursuant to section 668.11. *See id.* (requiring disclosure of expert witness for defendant "within ninety days of plaintiff's certification"). According to his expert designation, Iowa's rules of civil procedure then required Dr. Widmer to disclose:

> (1) The subject matter on which the witness is expected to present evidence under Iowa Rules of Evidence 5.702, 5.703, or 5.705.
>
> (2) A summary of the facts and opinions to which the witness is expected to testify.

Iowa R. Civ. P. 1.500(2)(*c*)(1)–(2). Defendants' certification designating Dr. Widmer conveyed, among other things, that he would "testify on the issues of standard of care, causation and damages." Defendants' timely certification of experts designated Dr. Widmer and indicated:

> Dr. Widmer is qualified to testify in this case based on his education, training, and experience, his review of the medical records of [mother and T.D.], birth video, deposition testimony in this case, and his care and treatment of [mother and T.D.]. *The purpose of calling Dr. Widmer will be to have him testify on the issues of standard of care, causation and damages.* Dr. Widmer is expected to testify at trial consistent with his deposition testimony given in this case.

(Emphasis added.) We conclude that subject matter was plainly disclosed by Dr. Widmer. *See id.* r. 1.500(2)(*c*)(1).

We also conclude the second prong of rule 1.500(2)(*c*) was satisfied. Prior to Dr. Widmer's designation, T.D. conducted an eight-hour deposition of Dr. Widmer. This deposition, T.D. claims, was before Dr. Widmer's expert designation and was therefore limited to his capacity as a treating physician, not as an expert. T.D.'s timeline for expert

designation is correct, but his argument overlooks actual testimony elicited from Dr. Widmer by T.D.'s counsel:

> Q. And you're familiar with that method of properly doing the McRoberts maneuver? A. I would say yes.
>
> Q. And did you witness them perform the McRoberts maneuver satisfactorily? A. I believe so.
>
> . . . .
>
> Q. Was the McRoberts maneuver successful? A. I believe so.
>
> Q. And do you believe it was properly executed? A. I do.
>
> . . . .
>
> Q. Were these maneuvers that you ordered effective, the application of the suprapubic pressure and the McRoberts maneuver? A. Yes
>
> Q. And would you please tell . . . why those maneuvers that you ordered were effective? A. They were performed as needed, and the baby was delivered.
>
> Q. And the baby was delivered, what, within a minute after the head was delivered, the entire body was delivered? A. I believe by our time we thought a minute, 35.
>
> Q. And you said you usually like to see the baby delivered three to five minutes after the head was delivered? A. Yes.
>
> Q. And that was well within your time frame; correct? A. It was.

This line of questioning—before his designation as an expert witness—makes clear Dr. Widmer believed the maneuvers he used were in conformity with the standard of care. Even if T.D. should "be able to expect that a treating physician's testimony will not include opinions on reasonable standards of care," the deposition of Dr. Widmer, in fact, did. *See Hansen*, 686 N.W.2d at 482 (addressing expert witness designation under Iowa Code section 668.11). The distinction between Dr. Widmer as

a treating physician and Dr. Widmer as a designated expert, for purposes of this disclosure, is inconsequential. We conclude Dr. Widmer's deposition disclosed a summary of facts and opinions to which he was expected to testify. *See* Iowa R. Civ. P. 1.500(2)(c)(2).

Relatedly, Dr. Widmer's direct testimony at trial was consistent with and within the scope of his deposition testimony. The Iowa Rules of Civil Procedure indicate, "The expert's direct testimony at trial may not be inconsistent with or go beyond the fair scope of the expert's disclosures, report, deposition testimony, or supplement thereto." *Id.* r. 1.508(4). T.D. claims Dr. Widmer's four-word standard of care opinion was in violation of rule 1.508(4)'s mandate. We disagree. At trial, the direct examination of Dr. Widmer inquired into whether he believed the maternal maneuvers conformed to the standard of care. His response, "I believe I did," was entirely consistent with his previous deposition testimony, which conveyed his belief that such maternal maneuvers were successful, proper, and effective. Moreover, Dr. Widmer's direct testimony did not go beyond the fair scope of his disclosures or deposition testimony. His expert designation plainly stated, "The purpose of calling Dr. Widmer will be to have him testify on the issues of standard of care, causation and damages." He testified exactly to that. Dr. Widmer's four-word testimony on the standard of care was well within the disclosed scope, and his direct testimony regarding the maternal maneuver standard of care was decidedly less detailed than his responses from the deposition testimony. The district court did not err by allowing Dr. Widmer to testify on his expert opinions.

2. *Fetal heart rate notes.* On the sixth day of trial, during redirect examination, Dr. Widmer referred to a single page of handwritten notes. He testified to creating the notes "last Friday" when he reviewed the birth

video and stated his notes would assist in recalling the times he heard fetal heart rates without the need to watch the entire birth video. The single page of handwritten notes contained nothing more than a column of video time stamps with the corresponding fetal heart rates.[6] Only after T.D.'s counsel published Dr. Widmer's notes to the jury did defendants later move to admit the notes as demonstrative evidence.

T.D. argues, as he did at trial, that Dr. Widmer provided an undisclosed opinion on the fetal heart rate in the birth video. Defendants take the position the handwritten notes were simply a summary of Dr. Widmer's observations used to refresh his recollection. We are persuaded to agree with defendants.

The disclosure requirements of rule 1.508 are generally limited to physicians retained as experts for purposes of litigation or for trial. *See Hansen*, 686 N.W.2d at 483; Iowa R. Civ. P. 1.508. However, "even treating physicians may come within the parameters of rule [1.508] when they begin to assume a role in the litigation analogous to that of a retained expert." *Hansen*, 686 N.W.2d at 483 (quoting *Morris-Rosdail v. Schechinger*, 576 N.W.2d 609, 612 (Iowa Ct. App. 1998)). This will occur if the treating physician focuses more on the legal issues in pending litigation and less on the medical facts and opinions associated in treating a patient. *Id.*

It is clear Dr. Widmer does not satisfy *Hansen*'s threshold test as a retained expert. This very narrow issue focuses on whether Dr. Widmer's handwritten notes reflect opinions in anticipation of litigation. We conclude they do not. Dr. Widmer's notes were derived from the birth video—when he was T.D.'s treating physician. His notes are the summary

---

[6]Dr. Widmer testified he calculated the fetal heart rate at a given time by listening to the birth video and counting on his watch.

of his observations and opinions during T.D.'s birth. Dr. Widmer's handwritten notes focused more on the medical facts and opinions of T.D.'s birth and less on the legal issues in the pending trial. *See id.*

**D. Access to Birth Video.** T.D.'s birth was captured on a twenty-one minute video. The birth video, recorded by T.D.'s aunt, depicted the delivery team's (Dr. Widmer and the HCHC nurses) efforts during T.D.'s birth. Experts from both parties reviewed the birth video prior to the trial. Later, T.D. offered the birth video into evidence, and it was admitted without objection. At trial, the jury first viewed the twenty-one minute birth video in its entirety. Then, throughout the trial, the record demonstrates the birth video was played, paused, and replayed no less than forty-one more times. In addition, defendants used ten screenshots from the birth video during direct examination of their expert witnesses. The ten screenshots were similarly admitted into evidence without objection.

Although the birth video was admitted into evidence, the district court denied T.D.'s request for the video to be fully accessible to the jury during deliberations. It did, however, allow full access to defendants' ten screenshots. The district court instructed the jury about the birth video as follows:

> You'll have the exhibits in the jury room. As stated by the lawyers in the case, if you wish to review the birth tape again, we will have that set up. We will play it from beginning to end. Actually, I think we probably do it in here, not in the jury room because that TV is bigger and you have a little bit more room, and I think the acoustics would probably be a bit better. So we would do that, just let somebody know. Very simple, okay?

Consequently, during deliberations, the jury asked to view the birth video. The district court permitted the video to be played once through without

the ability to pause, stop, or rewind. T.D. takes issue with the district court's restrictions and asserts the district court abused its discretion.

Iowa Rule Civil Procedure 1.926(2) provides, "When retiring to deliberate, jurors . . . shall take with them all exhibits in evidence except as otherwise ordered." Whether exhibits are submitted to the jury during deliberations is a matter within the district court's discretion. *See State v. Thompson*, 326 N.W.2d 335, 337 (Iowa 1982) (reasoning a district court's discretion provided by the rules of criminal procedure is "much the same in civil cases"); *see also Brooks v. Holtz*, 661 N.W.2d 526, 532 (Iowa 2003) (submission of exhibits to jury in civil case within district court's discretion).

In *Brooks*, we upheld a district court's decision to withhold video of the accident scene from jury deliberations, even though "the tape was shown to the jury several times during the trial and was admitted into evidence" and the plaintiffs requested the jury be allowed to have the video. 661 N.W.2d at 532. We noted when certain types of evidence are available to the jury, "such evidence might be given 'disproportionate importance in relation to other trial testimony, for which the jurors were required to call upon their recollection only.' " *Id.* (quoting *State v. Baumann*, 236 N.W.2d 361, 366 (Iowa 1975)).

Like *Brooks*, "[t]his judgment call was one for the trial court to make." *Id.* In deciding whether to submit the birth video for jury deliberation, the district court stated,

> What I'll do, and what I've done in the past, we'll wait and see if they want to see it again and what context. Sometimes they put a context, if it's for a particular purpose, maybe just general. Wait until it comes up. . . . Generally in these situations—situation's usually in a criminal case—I let them play it once. Play it just as it was played, one time, and they can resolve any issues they have regarding that.

> If there's some specific section they want to see to confirm or not confirm something that was said by an expert, that usually comes up, I play back the whole thing.
>
> . . . .
>
> I think they should have at least one shot at it, see the whole thing again, just as it was played in court. So they will—I'll tell them at the end of the thing, if you want to look at it, let us know, you can look at it.

It is clear the district court was concerned with the context of the jury's reason for viewing the video. To avoid giving a disproportionate importance to specific sections of the video, the district court's judgment call was to play the entire video once. This exercise of discretion was not clearly unreasonable. *See id.*

Unlike the caselaw T.D. cites, the unique situation here contemplated extensive competing expert opinions over an eight-day trial. *See, e.g.*, *State v. Jackson*, 387 N.W.2d 623, 629 (Iowa Ct. App. 1986) (holding the district court did not abuse its discretion in granting jury's request to view crime scene video without limitation); *State v. Hernandez*, No. 12–0219, 2013 WL 1452958, at \*6 (Iowa Ct. App. Apr. 10, 2013) (concluding the district court was within its discretion in allowing the jury unfettered access to audio recordings of the criminal event). In its totality, the birth video lasted twenty-one minutes. Yet, an overwhelming majority of the forty-one paused or replayed sections focused on the one minute and ten seconds following recognition of shoulder dystocia. In view of the roughly nineteen minutes of extraneous details on the video, and to be quite frank, the personal nature of the birth footage,[7] the district court was correct to prevent the video from becoming disproportionately

---

[7]The birth video captured the reality of T.D.'s delivery, which upon its first publication to the jury, caused one juror to "apparently [become] faint—fainted, or [become] ill."

important in the face of vast expert opinions. The district court did not abuse its discretion by limiting access to the birth video.

**IV. Conclusion.**

For the aforementioned reasons, we affirm the district court's judgment. Specifically, we conclude the district court did not commit reversible error in the specifications of negligence it submitted to the jury. We determine Dr. Widmer's CME records were not admissible to show a breach in the standard of care. However, although it was an abuse of discretion for the district court to prohibit the use of CME records as impeachment evidence, the error was harmless. Further, defendants' expert opinion testimony was properly disclosed and did not reflect an opinion in anticipation of litigation. We also conclude the district court did not abuse its discretion by limiting the jury's access to the birth video.

**AFFIRMED.**

All justices concur except Waterman, J., who takes no part.